**Marcus EDWARDS, Petitioner,**

v.

**Paul MURPHY, Superintendent, Old Colony Correctional Center, Defendant.**

**Michael Payne, Petitioner,**

v.

**Paul Murphy, Superintendent, Old Colony Correctional Center, Defendant.**

**Nos. Civ. 98–12000–REK, 99–10012–EFH.**

United States District Court, D. Massachusetts.

April 24, 2000.

Page Kelley, Committee for Public Counsel Service, Cambridge, MA, for Marcus Edwards, plaintiff.

Cathryn A. Neaves, Attorney General's Office, Boston, MA, L. Scott Harshbarger, Attorney General's Office, Torts Division, Boston, MA, for Paul Murphy, defendant.

David P. Hoose, Katz, Sasson & Hoose, Springfield, MA, for Michael Payne, respondent.

## Opinion

KEETON, District Judge.

In this consolidated action, Marcus Edwards ("Edwards") and Michael Payne ("Payne") petition this court for habeas corpus relief under 28 U.S.C. § 2254. For the following reasons, their petitions are dismissed.

## I. Factual and Procedural Background

### A. Procedural History

In April, 1993, a Suffolk County grand jury returned indictments against both petitioners alleging two counts of murder, two counts of armed robbery, and one count of illegal possession of a firearm.

In May, 1994, Judge Stephen Neel heard petitioners' motions to suppress eyewitness identifications. The court denied those motions on June 3, 1994.

On June 6, 1994, both petitioners were tried before a Suffolk County jury with Judge Moriarity presiding. On June 14, 1994, the jury returned guilty verdicts of murder in the first degree against both Edwards and Payne. Edwards and Payne were each found guilty also of one count of armed robbery and one count of the possession of a firearm. Each was acquitted on the other count of armed robbery.

On June 21, 1994, Edwards and Payne were sentenced to life in prison without the possibility of parole for the murder convictions, and lesser concurrent sentences for the other convictions.

Both Edwards and Payne appealed their convictions to the Supreme Judicial Court (SJC). On February 17, 1998, in a published opinion, *Commonwealth v. Michael Payne*, 426 Mass. 692, 690 N.E.2d 443 (1998), the SJC affirmed petitioners' convictions.

Edwards filed a petition for writ of habeas corpus with this court on September 21, 1998. *See Edwards v. Murphy*, Civil Action No. 98–12000–REK. Payne filed a petition for writ of habeas corpus with this court on December 22, 1998. *See Payne v. Murphy*, Civil Action No. 99–10012–EFH.

On April 21, 1999, respondent Murphy filed a Motion to Consolidate Habeas Corpus Proceedings Pursuant to Federal Rule of Civil Procedure 42(a). *See* Civil Action No. 99–10012–EFH, Docket No. 6 and Civil Action No. 98–12000–REK, Docket No. 18. On June 18, 1999, respondent's motion was allowed and petitioners' cases were

consolidated, the lead case being *Edwards v. Murphy*, 98–12000–REK. *See* Docket No. 20 in Civil Action 98–12000–REK.

### B. Petitioners' Arguments for Habeas Corpus Relief

Both petitioners argue that the trial judge's instructions on reasonable doubt, which contained "moral certainty" language, violated their rights under the Fourteenth Amendment because, they argue, the instructions "permitted the jury to find guilty under a standard less than beyond a reasonable doubt." Docket No. 23 at 9.

Payne, alone, also argues that both the motion judge and the SJC failed to protect his due process rights when ruling that the pre-trial photographic identifications of him by several witnesses were not suggestive and were reliable despite the fact that the identifying witnesses were exposed to media images of him while he was in police custody for the crimes for which he was eventually convicted. *See* Docket No. 14 at 12.

### C. Facts at Trial

#### 1. As recited by the SJC

The SJC provided the following recitation of the facts "in the light most favorable to the Commonwealth, reserving certain details for discussion in conjunction with certain issues raised." *Com. v. Payne*, 426 Mass. at 693, 690 N.E.2d. at 446.

On March 28, 1993, at approximately 4 a.m., the defendants and the two victims, Kevin Christopher and Lloyd Industrious, were among a group of people gathered on Lindsay Street in the Dorchester section of Boston. A party at a Lindsay Street residence had just broken up, and the victims were sitting in a motor vehicle. According to several eyewitnesses, the defendants suddenly fired several shots at the victims, killing them. At least one of the defendants then approached, grabbed jewelry from one or both of the victims, and fled on foot. Christopher suffered eleven gunshot wounds and Industrious seven.

*Id.* at 693–94, 690 N.E.2d 443.

#### 2. As recited by the Motion Judge for the Purpose of the Suppression Hearing

The motion judge, Judge Neel, in denying petitioners' motions to suppress identifications, made the following findings of fact.

Based on the credible evidence presented at the suppression hearing, I make the following findings.

On Saturday, March 27, 1993, at approximately 10:30 p.m., Charae Chretien and three friends (Carol Rich, Anna Bodden and Stacy Williams) arrived at a party at 28 Lindsay Street in Boston. Charae was just turning nineteen. Anna and Carol were then sixteen. Charae brought the other three in her car. With them were Bree Peterson and Adrienne Castillo, both then seventeen. After dropping Stacy off, and attempting unsuccessfully to enter another party on Commonwealth Avenue, Charae, Carol, Anna, Bree and Adrienne returned to the Lindsay Street party at or soon after midnight.

Anna testified that she had two beers at the party on Commonwealth Avenue, with the same group of young women with whom she had been at Lindsay Street. I do not credit that testimony, in view of the testimony of Charae that the group was not admitted to that party, and in view of Anna's own prior inconsistent statement on police. (Exhibit 5 at 4). At the hearing, Anna was clearly terrified and in tears, and said that she was in fear for her life should her testimony help convict the defendants. In my judgment, she chose not to remember certain facts as a result of these fears, and manufactured other facts designed to reduce the utility of her testimony.

After the group returned to the party at Lindsay Street, they remained there until sometime after 4:00 a.m. on Sunday, March 28. During that time, neither Charae, Carol, Adrienne or Bree had any alcoholic beverages or drugs. Anna testified that she had "a lot" to drink, from "wine and stuff" set out in plastic cups on a table; she estimated that she had five drinks, stated that she ate food as well, and testified that she "felt drunk" and had trouble walking when she left the party.

Only Carol testified that she saw Anna drinking; Carole is Anna's cousin. Bree, Adrienne and Charae testified that they did not see Anna having any drinks. I find that Anna did have some alcoholic beverages after returning to the party; that she had fewer than five cups of wine; and that, in view of the four-hour period over which she consumed those drinks, her eating of food during that period, and her average height and weight, she was at most mildly inebriated by the time she left the party. Her faculties and powers of observation and recall were not significantly impaired.

Anna, Charae, Adrienne, Carol and Bree left the party as it was breaking up sometime after 4:00 a.m., and walked up the street toward Charae's car. With them was "Jamie." When they arrived at the car, Charae sat in the driver's seat' Adrienne sat in the middle next to her; Anna sat in the right front passenger seat; Carol sat behind Charae; Jamie sat behind Adrienne; and Bree sat behind Anna.

### Identification by Anna Bodden

As she sat in the car after the party, Anna saw "Pookie" come over to the driver's side and heard him converse with Charae. Anna had seen "Mark, Pookie, Chris and Lonnie" at the party. Anna heard Pookie ask Charae if she would call him, and he had her repeat his telephone number. As and just after

Pookie left the driver's side of the car, and while he was standing near the car, Anna heard shots, looked in front of the car in which she sat, and saw people shooting. She watched the shooting for about five seconds. The lighting was sufficient to see the persons doing the shooting. After the shooting stopped, Anna saw someone take a chain from one of the victims. At the suppression hearing Anna stated that she did not recall, and could not describe, the two or three persons doing the shooting, or the person who took the chain.

Anna saw one victim on the right side of her car being shot, and then saw the shooter run back toward her. She and the other occupants of the car, in shock and hysterical, then drove off.

At about 7:00 p.m. on March 28, 1993, Boston police officers Det. Sgt. Charles M. Horsley and Det. Trailer visited Anna at her aunt's house. They interviewed her, but showed her no photographs at that time. She told them that Marcus Edwards had been at the party on Lindsay Street.

On March 29, 1993, Det. Sgt. Horsley and Det. Trailer, accompanied by Det. Halsted, again visited Anna at her aunt's house. This time they showed her a book containing front and side photographs of eighty-eight young black males. The photographs were arranged so that four subjects were pictured on each page; when the book was opened after the first page, Anna saw eight different subjects. None of the photographs bore names or similar written identification.

The officers sat Anna at a table, put the books before her, and asked her to go through each page and to tell them when she saw someone she recognized or knew as having been at the party or involved in the shooting. Anna looked through the book and, pointing at their photographs, identified Marcus Edwards (page 8, photograph number 30) as the boy she saw take a chain from one vic-

tim as he lay on the ground; Lonnie Watkins (page 11, photograph number 42) as one of the boys on the porch at the party, and one who shot that victim; and two other persons.

Contrary to Anna's testimony at the suppression hearing, I find that the officers did not tell her to stop at two or three specific pages; did not tell her to go back over certain pages; and did not ask her if she was sure that she recognized no one on certain pages. Although Anna testified that she felt at the time that she had "no choice but to pick out someone," I find that she was not coerced and that the officers made no suggestions or instructions of the type she described.

### Identification by Adrienne Castillo

As Adrienne sat in the front middle seat of Charae's car after the party, she observed two males who had been at the party. They stood on either side of a car parked in front of where she sat, separated from her by an empty parking space. One, who was tall and skinny, stood by the driver's side; the other, short one stood at the passenger side. At the party she had noticed that the latter wore a bandanna and a big gold chain, and had a cane with a gold handle.

Adrienne also observed Charae, in the driver's seat next to her, talking with someone she had earlier heard referred to as "Marcus." Adrienne heard Marcus give Charae his phone number and ask her to repeat it. She observed that Marcus wore a dark jacket with "Sox" in white on the back. She described Marcus as about five feet seven inches tall, with light brown, distinctive eyes.

Marcus had left Charae and was in front of her car when Adrienne heard noises, and turned around toward the front. There she saw between four and eight people, including Marcus and Michael Payne (whom she had seen at the party), shooting. She saw Michael in

the street, toward the driver's side of her car. She observed that Michael was wearing a white shirt, and was five feet six or seven inches tall. It was dark, but she could see the faces of the shooters. Out of the corner of her eye she also saw Lonnie Watkins, who was over six feet tall, on the sidewalk. She had spoken with him at the party and had asked him his name. She does not recall seeing him with a gun in his hand.

During the shooting Adrienne did not duck, but watched. She and the others in the car were silent until the shooting stopped. She saw the victim on the driver's side of the car in front of her "hanging through the car" and the other victim lying on the sidewalk. After she observed Marcus shoot at the short victim, she saw him run after the shooting had stopped, come back, shoot that victim in the head at close range, take his chain, and run again.

At approximately 4:00 p.m. on March 28, 1993, Det. Horsley and other officers interviewed Adrienne at the District Two station in Roxbury. She stated that Marcus Edwards and Michael Payne were two of the shooters. They did not show her photographs at that time.

On the evening of March 29, Det. Horsley, Det. Halsted and Det. Trailer went to Adrienne's home and showed her the book of eighty-eight subjects. At the time, they were alone in a room with her. As with Anna, they placed the book before Adrienne and asked her if she recognized anyone from the party or the incident. She stopped at Edward's picture (page 8, number 30) and said "That's Pookie." she also selected the photograph of Ricardo Middleton (page 10, number 40), saying that it "looks like Chris, but Chris is darker." She recalled Chris as being beside the car of the victims, but did not recall anything that he did. The book did not contain a photograph of Michael Payne.

During the first week after the shootings, Adrienne saw pictures of persons arrested, both on television and in newspapers.

On April 7, 1993, Det. Horsley met with Adrienne in Boston, just prior to her testimony before the grand jury. No one else was present. He handed her a stack of fourteen photographs, asking her to look through them and to identify anyone present at the incident. He had selected the photographs from those of black males of approximately the same age and complexion. The photographs contained no written identifying information. He did not suggest that she choose any particular photograph. She identified Michael Payne's photograph as looking like "a boy who looks like Michael." She had seen Michael's picture in the media, but identified his photograph based on her memory of his presence at the party and his participation in the shooting.

### Identification by Bree Peterson

As Bree sat in the back passenger-side seat of Charae's car, she saw Charae, in the driver's seat, talking with a young man in the street. She observed that he was light-skinned, attractive, about five feet seven inches tall, and had "nice yes." She had heard him referred to at the party as "Pookie." He shut the driver's side door and walked in front of the car. Bree then observed him and three others begin shooting. He was on the right side of the two victim's car. She saw him stop shooting, bend down in front of him, pick something up, then run back by the passenger's side of the car in which Bree sat.

After the incident, Det. Horsley interviewed Bree at her workplace, but did not show her photographs. On April 7, 1993, just prior to her grand jury testimony, Det. Horsley showed her the group of fourteen photographs referred to above, a couple at a time. He asked her to look at them and tell him if any looked like persons at the party, but made no other suggestion to her. Bree identified the photographs of Michael Payne (number 406109) and Tim Taylor (number 393183) as looking like two males who were at the party, and on the street at the time of the shooting. Although Bree had seen news accounts of the shooting, she had not seen photographs of either Payne of Taylor prior to April 7. She did not know the name of either.

### Identification by Charae Chretien

Charae had two conversations at the party prior to the shootings. "Pookie" and Charae had been dancing at the party and later, on the front porch, Pookie told her his telephone number and asked her to call him. Michael Payne asked her if she remembered him, and reminded her that they had bowled together six or seven years before. She replied that she recognized him and said, "You're Michael, right?" He said; "Yes."

After the party, she sat in the driver's seat of her car talking with Pookie. She observed him to be "taller than me" (she is five feet five inches), between five feet seven inches and six feet tall. She saw that he had "pretty eyes," light and "hazel-greenish." He asked her if she remembered his telephone number, and she said that she did and repeated it. She saw him leave the car and walk in front of it. Then she saw him and six or seven of his friends, including Michael, walk to another car and start shooting. She saw Michael shoot at the victim on the passenger side of the victim's car, and grab a chain from a victim. She saw Pookie shoot at the victim on the passenger side of the victim's car, and grab a chain from a victim. She saw Pookie shoot that victim, run past her, then run back to the victims, shoot one more time, and grab a gold chain.

Sometime after 4:00 p.m. on March 28, 1993, Det. Horsley interviewed Char-

ee at the District Two station in Roxbury. She told him the names of Pookie and Michael Payne, and said that they were two of the shooters.

The following evening, Det. Horsley, Det. Halsted and Det. Trailer went to Charae's home. Det. Horsley sat Charae at her kitchen table, put the book of eighty-eight subjects before her, and asked if she could identify anyone who was at the party or involved in the shootings. The officers made no other suggestions to Charae. Charae stopped at the photograph of Marcus Edwards (page 8, number 30) and identified him as Pookie, the boy at the party who had given her his telephone number. She also identified a photograph of Mark Anderson, who she said had "eyes that look like a boy who had on a hood at the party." Prior to this time she had not seen pictures in the media of suspects arrested for the shootings.

On April 7, 1993, just prior to her testimony to the grand jury, Charae met with Det. Horsley, who handed her the above-mentioned group of fourteen photographs. He made no suggestion to her other than asking her to identify anyone she saw at the party or at the shooting. She picked out a photograph of Michael Payne. Prior to that time she had seen Michael's picture in the newspaper and on television; however, that did not influence her identification of him, which was based on her memory of the party and the shootings.

Docket No. 8, Item No. 1 at 64–73 (Payne Supp. Ans) in Civil Action 99–10012–EFH.

*3. Jury Instructions at Trial*

The trial judge's jury instructions on reasonable doubt were as follows:

Now the presumption of innocence means that alright, but it also means a great deal more than that. The presumption of innocence also means that no one charged with having committed a crime must prove his or her innocence. Quite the contrary is true. The Commonwealth, the government must prove his or her guilt and must prove it beyond any reasonable doubt. And it's the absolute right of everyone of us, that includes all of you, it includes me, and it includes those two defendants over there, if charged with crime to simply come to court, plead not guilty, and then say to the Commonwealth, now you prove it. And say absolutely nothing else if we wish.

The burden then rests upon the Commonwealth to prove each essential element of the crime that has been charged and to prove it beyond any reasonable doubt. Now, I've stressed, I hope you've noticed that I stress that last expression, beyond any reasonable doubt. I've done that quite deliberately, because that is the second, but equally important part of this concept. It, too, requires some explanation. What precisely does that mean?

Just by way of contrast, if early last week when you came here to court to serve as jurors you had been selected to sit on the trial of a civil case rather than a criminal case, you probably would have learned in the course of such a trial that in a civil case one side or the other has the burden of proving facts by what we call a fair preponderance of evidence, which really means to prove that a given fact is more likely, more probable, than not. That's the standard in a civil case.

In a criminal case, and this is a criminal case, the burden that rests on the government is much greater than that. To simply prove in a criminal case that the defendant is probably guilty or more likely guilty than not is not nearly enough. In a criminal case the facts must be proved beyond reasonable doubt. That means to a moral certainty. Anything less than that degree of conviction as to any fact or facts necessary to a conviction upon a particular charge would mean that the Commonwealth had not proved its case, and the defendant would be entitled to an acquittal.

Now a word of caution, however. Proof beyond reasonable doubt does not mean proof beyond all doubt or an imaginary doubt. A reasonable doubt, for example, is not the doubt that might exist in the mind of a man or a woman searching for some doubt, for some excuse to acquit a defendant. It does not mean that. And it does not mean absolute proof or proof to a mathematical certainty, if there is such a thing as mathematical certainty. What it does mean is such proof as fully convinces you as reasonable persons earnestly seeking the truth that the defendant is guilty.

But if after all is said and done there remains in the minds of the jury any reasonable doubt as to the existence of any fact or facts necessary to a conviction upon the particular charge, then it becomes the duty of the jury to resolve that doubt in favor of the defendant and find him not guilty.

Docket No. 14, Exh. 1 at A1–A3 (Transcript of Trial Judge's Jury Instructions) in Civil Action No. 98–12000–REK.

## II. Standard of Review

### A. Introduction

This habeas case is governed by the Antiterrorism and Effective Death Penalty Act, Pub.L. No. 104–132, 110 Stat. 1214 (1996) (codified in scattered section of 28 U.S.C.) (hereinafter "AEDPA"). That statute, enacted in 1996, greatly reduced the scope of a federal habeas court's review over a state court proceeding in several ways.

First. Federal habeas courts are instructed by AEDPA's section 2254(e) to presume state court findings of fact to be correct, a presumption the habeas petitioner can rebut only by clear and convincing evidence. 28 U.S.C.A. § 2254(e)(1). As the Court of Appeals for the First Circuit has recently stated, "[f]or this purpose, factual issues are defined as basic, primary, or historical facts: facts in the sense of a recital of external events and the

credibility of their narrators." *Coombs v. State of Maine,* 202 F.3d 14, 18 (2000) (internal quotations and citations omitted).

Second. As for a federal habeas court's review of a state court's legal determinations, including "mixed questions of law and fact in which legal principles are applied to historical facts," *id.,* habeas relief shall be granted only where the state court's adjudication

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). *See also O'Brien v. Dubois,* 145 F.3d 16, 22–23 (1st Cir.1998).

### B. First Circuit Jurisprudence Interpreting Section 2254(d)(1) of AEDPA

#### 1. Introduction

Section 2254(d)(1) has been the subject of much interpretation and controversy among the circuit courts of appeals. Almost two years ago, in *O'Brien v. Dubois,* 145 F.3d 16, 22–23 (1st Cir.1998), the United States Court of Appeals for the First Circuit set forth its interpretation of section 2254(d)(1), the section applicable to the present consolidated cases. *O'Brien* announced a two-step analysis for examining claims for habeas relief under section 2254(d)(1) of AEDPA.

First, the habeas court asks whether the Supreme Court has prescribed a rule that governs the petitioner's claim. If so, the habeas court gauges whether the state court decision is "contrary to" the governing rule. In the absence of a governing rule, the "contrary to" clause drops from the equation and the habeas court takes the second step. At this stage, the habeas court determines whether the state court's use of (or fail-

ure to use) existing law in deciding the petitioner's claim involved an "unreasonable application" of Supreme Court precedent.

*Id.* at 24.

2. *"Contrary To"*

With regard to the "contrary to" prong, the court in *O'Brien* looked to the *Teague* line of cases for guidance, and held that

an affirmative answer to the first section 2254(d)(1) inquiry—whether the Supreme Court has prescribed a rule that governs the petitioner's claim—requires something more than a recognition that the Supreme Court has articulated a general standard that covers the claim. To obtain relief at this stage, a habeas petitioner must show that Supreme Court precedent requires an outcome contrary to that reached by the relevant state court.

We caution that this criterion should not be applied in too rigid a manner. A petitioner need not point a habeas court to a factually identical precedent. Oftentimes, Supreme Court holdings are "general" in the sense that they erect a framework specifically intended for application to variant factual situations. These rules sufficiently shape the contours of an appropriate analysis of a claim of constitutional error to merit review of a state court's decision under section 2254(d)(1)'s "contrary to" prong. . . .

*Id.* at 24–25.

Examples of such "framework" analyses that would be governed by the "contrary to" prong of § 2254(d)(1), are, according to the *O'Brien* court,

easily located. *See, e.g., Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (developing test applicable to claimed violations of right to public trial), *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (explaining test for resolving claims of ineffective assistance of counsel); *Jackson v. Virginia,* 443 U.S. 307,

99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (formulating test governing insufficiency of evidence claims).

*Id.* at 25, n. 6

Recognizing, however, that a determination of whether "contrary to" review is appropriate will prove difficult in some cases, the *O'Brien* court stated finally, that

the key inquiry, at bottom, is whether a Supreme Court rule—by virtue of its factual similarity (though not necessarily identicality) or its distillation of general federal law precepts into a channeled mode of analysis specifically intended for application to variant factual situations—can fairly be said to require a particular result in a particular case.

*Id.* at 25.

3. *"Unreasonable Application"*

The second step in a section 2254(d)(1) analysis is triggered when the federal habeas court finds "no Supreme Court precedent [that] is dispositive of a petitioner's claim, [and thus] . . . a fortiori, . . . no specific rule to which the state court's decision can be 'contrary.'" *Id.* at 25.

[A] federal habeas court then determines whether the state court decision reflects an unreasonable application of clearly established Supreme Court jurisprudence. This reduces to a question of whether the state court's derivation of a case-specific rule from the Court's generally relevant jurisprudence appears objectively reasonable.

*Id.*

This second step has been subject to competing interpretations by the circuit courts of appeals. Common to all the varying interpretations, however, is the consensus that this standard is a difficult one to meet. The Court of Appeals for the First Circuit has said, in reference to this second prong of section 2254(d), that

the "unreasonable application" clause does not empower a habeas court to grant the writ merely because it disagrees with the state court's decision, or

because, left to its own devices, it would have reached a different result. Rather, for the writ to issue, the state court decision must be so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes.

Id. at 25.

In contrast to other circuits, the *O'Brien* court explained that their interpretation of the "unreasonable application" prong is not as limited as its sister circuits have interpreted it to be.

The Fifth Circuit has articulated an unreasonableness standard that allows the writ to issue "only if a state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." *Drinkard*, 97 F.3d at 769; *accord Neelley*, 138 F.3d at 924. We decline to adopt this formulation for two reasons. First, the test is circular inasmuch as it defines "unreasonable application" by reference to what "reasonable jurists" think about an issue. Second, and more importantly, we regard the test as too deferential because it focuses on the reasonableness of individual judges, more so than on the reasonableness of judicial decisions. Given that reasonable judges occasionally make unreasonable decisions, the *Drinkard* court's interpretation of the "unreasonable application" clause could drain it of much of its practical meaning.

*Id.* at 25, n. 7.

*4. A Federal Habeas Court Must Reach Both Prongs of § 2254(d)(1)*

Finally, more recently in *Vieux v. Pepe*, the Court of Appeals for the First Circuit further explained the analytic framework of section 2254(d)(1) by stating that a federal habeas court must reach both prongs of section 2254(d)(1), even if a decision under the first seems to foreclose a contrary decision under the second.

[I]n certain cases, especially those involving non-"framework" claims, Court precedent will be sufficiently specific that petitioner's claim will either be contrary to or entirely consonant with the Court's rulings. If the state decision is consistent with the relevant Court decision, it plainly would not be an unreasonable application of Court precedent. Therefore, the federal court will be able to dispatch swiftly any argument under the second step of analysis.

To say this, however, is not to say that the second step analysis is unnecessary, for unless a habeas court grants relief under the "contrary to" prong, it will be required to analyze the petitioner's claim under the "unreasonable application" prong as well. To rule otherwise would be to ignore the word "or" in the statute limiting our power to grant the writ if the state decision was "contrary to, or involved an unreasonable application of," federal law.

*Vieux v. Pepe*, 184 F.3d 59, 64 (1st. Cir. 1999) (citations omitted).

### III. Petitioners' Argument for De Novo Review

█ As a preliminary matter, I reject petitioners' argument that because the Supreme Judicial Court of Massachusetts (SJC) failed to cite to federal law in its adjudication of petitioners' habeas claims, this federal district court then must review petitioners' claims *de novo*, without the deference required under AEDPA.

The principal case that petitioners cite in support of their contention that this court should review their claims *de novo* is *Cardwell v. Greene*, 152 F.3d 331 (4th Cir. 1998). In that case, the Court of Appeals for the Fourth Circuit determined it necessary to forgo review of the state court's application of clearly established Federal law because the state court had summarily dismissed the habeas petition without articulating any rational basis for its adverse determination. In other words, the court in *Cardwell* determined that because of the bare record in the state court below it had no choice but to ascertain independently—

without any deference to the state's determination because that state determination was without any reasoned explanation—whether the petitioner was being held in violation of the federal Constitution.

*Cardwell* is inapposite for the following reasons.

 *First.* As a matter of statutory construction, AEDPA does not require that a state court *cite* to federal law in order for a federal court to assess properly the federal constitutionality of the state petitioner's conviction. All that is required, by force of AEDPA's plain language, is that the underlying state adjudication "*resulted in* a decision that was contrary to, or *involved* an unreasonable application of, clearly established Federal law ..." 28 U.S.C. § 2254(d)(1) (emphasis added). The Court of Appeals for the First Circuit has said as much in *O'Brien* when, in discussing the second prong of § 2254(d)(1), they instructed "the habeas court [to] determine[ ] whether the state court's use of (*or failure to use*) existing law in deciding the petitioner's claim involved an 'unreasonable application' of Supreme Court precedent." *O'Brien,* 145 F.3d at 23 (emphasis added). Although it may be more difficult to review the "application of" federal law when the state's determination does not discuss federal law, that added difficulty does not preclude the applicability of AEDPA's deferential review. On the contrary, AEDPA's plain language and First Circuit jurisprudence together mandate that the federal habeas court review the *result* of the state court's outcome to determine its compatibility with the Constitution of the United States under the standard set forth in § 2254(d)(1).

*Second.* Unlike the Virginia Supreme Court decision that was reviewed in *Cardwell,* the Massachusetts Supreme Judicial Court did not summarily deny petitioners' claims but wrote a lengthy opinion addressing both issues raised here in federal habeas review, as well as several others. Thus, although it is true that the SJC did not cite to federal law in its rejection of petitioners' claims, *see Com. v. Payne,* 426 Mass. 692, 690 N.E.2d 443 (1998), it did consider those claims at length, citing to ample state authority, much of which provides commensurable or even greater protection to defendants than that guaranteed by the Constitution of the United States.

## IV. Analysis of Reasonable Doubt Instruction in Light of Moral Certainty Language

### A. Introduction

Petitioners contend that the trial judge's use of "moral certainty" to explicate the reasonable doubt standard permitted the jury to return a guilty verdict on a standard that is not constitutionally supportable.

*In re Winship* established the principle, by now axiomatic but not taken for granted, that in a criminal trial, the government must prove every element of the offense charged beyond a reasonable doubt. *See In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

Since that 1970 case, the Supreme Court jurisprudence has become still more instructive as to when jury instructions satisfy the constitutional standard and when they offend it. *See, e.g., Victor v. Nebraska,* 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994); *Estelle v. McGuire,* 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Cage v. Louisiana,* 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990); *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This jurisprudence came to a new focus, in 1990, when *Cage v. Louisiana* was decided by the Supreme Court (the only Supreme Court decision to hold that a definition of reasonable doubt violated the Due Process Clause, *see Cage,* 498 U.S. at 41, 111 S.Ct. 328), and again later, in 1994, when *Victor v. Nebraska* was decided. *See Victor,* 511 U.S. at 5, 114 S.Ct. 1239. Some scholars and courts have expressed the thought that an apparent discrepancy between *Cage* and *Victor*

is in fact a further clarification of the formulation for a constitutionally supportable jury charge that includes "moral certainty" language. *See e.g.*, Stephen J. Fortunato, Jr., *Instructing on Reasonable Doubt after Victor v. Nebraska: A Trial Judge's Certain Thoughts on Certainty*, 41 VILL.L.REV. 365 (1996); George M. Dery III, *The Atrophying of the Reasonable Doubt Standard: The United States Supreme Courts Missed Opportunity in Victor v. Nebraska and Its Implications in the Courtroom*, 99 DICK.L.REV. 613 (1995); Note, *Reasonable Doubt: An Argument Against Definition*, 108 HARV.L.REV. 1955 (1995); Paul C. Smith, Note, *The Process of Reasonable Doubt: A Proposed Instruction in Response to Victor v. Nebraska*, 41 WAYNE L.REV. 1811 (1995).

## B. The Supreme Court Jurisprudence

*Cage* involves a jury instruction that defined reasonable doubt as a doubt that

would give rise to a grave uncertainty, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a moral certainty.

*Cage*, 498 U.S. at 40, 111 S.Ct. 328.

The Supreme Court in *Cage* held this jury instruction constitutionally insupportable because, as the Court said, "it becomes clear that a reasonable juror" when considering the words "substantial" and "grave," with reference to and in close proximity to the phrase "moral certainty," rather than in the explicit context of an evidentiary certainty, "could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." *Id.* at 41, 111 S.Ct. 328.

Four years later in *Victor*, the Supreme Court upheld the trial judge's jury instructions that nevertheless contained "moral certainty" language. In so doing, the Court explained more fully in what circumstances "moral certainty" language is constitutionally insupportable, that is when a reasonable likelihood exists that the jury applied the instruction in an unconstitutional manner. *See Victor*, 511 U.S. at 6, 114 S.Ct. 1239 (citing *Estelle v. McGuire*, 502 U.S. at 72, 112 S.Ct. 475).

The Supreme Court began by explaining the historical context of the phrase "moral certainty."

By the beginning of the Republic, lawyers had borrowed the concept of "moral evidence" from the philosophers and historians of the 17th and 18th centuries. James Wilson, who was instrumental in framing the Constitution and who served as one of the original Members of this Court, explained in a 1790 lecture on law that "evidence ... is divided into two species—demonstrative and moral." ... The phrase "moral certainty" shares an epistemological pedigree with moral evidence. Moral certainty was the highest degree of certitude based on such evidence.

*Victor*, 511 U.S. at 11–12, 114 S.Ct. 1239 (citations omitted). In such a context, the Court conceded, it became clear that the phrase "moral certainty" has lost its meaning as that species of certainty that is inextricably bound to the facts in evidence and could be closer in meaning, as the petitioner in *Victor* feared, to a kind of certainty that is based instead on some personal, non-fact-related conviction.

This conclusion, however, did not persuade the Court that the jury instructions at issue containing "moral certainty" language were automatically infirm. On the contrary, the consideration of the constitutionality of the state court's jury instructions must take into account the charge as a whole and the placement of the "moral certainty" language in relation to instructions concerning the evidence received in the presence of the jury.

[T]he moral certainty language cannot be sequestered from its surroundings.

In the *Cage* instruction, the jurors were simply told that they had to be morally certain of the defendant's guilt; there was nothing else in the instruction to lend meaning to the phrase. Not so here. The jury in [petitioner's] case was told that a reasonable doubt is "that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge." The instruction thus explicitly told the jurors that their conclusion had to be based on the evidence in the case. Other instructions reinforced this message. The jury was told "to determine the facts of the case from the evidence received in the trial and not from any other source." ... Accordingly, there is no reasonable likelihood that the jury would have understood moral certainty to be disassociated from the evidence in the case.

*Id.* at 16, 114 S.Ct. 1239 (citations omitted)

In combination, the Supreme Court's decisions in *Cage* and *Victor* suggest at least the following two conclusions. Standing alone, "moral certainty" language might very well violate the Due Process Clause and allow a jury with more than a reasonable doubt to find the defendant guilty nevertheless. Yet, when a judge's instructions explain "moral certainty" in context as certainty that relates to the jury's consideration of the evidence received at trial in their presence, it is no longer reasonably likely that a jury would understand the words "moral certainty as suggesting a standard of proof lower than due process requires." *Victor,* 511 U.S. at 11–12, 114 S.Ct. 1239.

## C. Clearly Established Federal Law in Light of *Com. v. Payne* and *Com. v. Watkins*

■ The SJC in *Com. v. Payne* upheld the trial judge's jury instructions despite the fact that it includes "moral certainty"

language. The SJC did so summarily in *Com. v. Payne* but cited its more detailed opinion of six months earlier, in which it analyzed an instruction "virtually identical to the one at issue, given by the same judge, in a previous trial involving the same shooting." *Com. v. Payne,* 426 Mass. at 698–99, 690 N.E.2d 443 (citing *Com. v. Watkins,* 425 Mass. 830, 837–839, 683 N.E.2d 653 (1997)).

The SJC's analysis in *Watkins* is entirely consistent with the clearly established federal law described above in Part IV.A–B. The SJC states, consistent with federal law, that "in determining the propriety of such instructions, we consider the charge as a whole and not from a consideration of isolated portions." *Watkins,* 425 Mass. at 837, 683 N.E.2d 653 (citations and quotations omitted). The opinion in *Watkins* adds that the mere presence of "moral certainty" language does not necessarily offend the Constitution as long as "it is linked with language that lends content to the phrase." *Id.* at 838, n. 10, 683 N.E.2d 653. And the SJC explained that the trial judge linked the phrase "reasonable doubt" to facts in evidence and stated:

If after all is said and done there remains in the minds of the jury any reasonable doubt as to the existence of fact or facts necessary to a conviction upon the particular charge, then it becomes the duty of the jury to resolve that doubt in favor of the defendant and to find him not guilty.

*Id.* at 838, 683 N.E.2d 653. The SJC concluded that this linkage between "moral certainty," "reasonable doubt" and facts in evidence "clearly informed the jurors that the Commonwealth had the burden of producing evidence and the burden of proof to persuade the jury to this high degree of certainty." *Id.* at 838, n. 11, 683 N.E.2d 653.

In arguing that the SJC's decision is contrary to, or involves an unreasonable application of, clearly established federal law, petitioners point to one of the SJC's reasons for concluding that the trial

judge's instructions are constitutionally sound: that the instructions contrast the criminal burden of proof—beyond a reasonable doubt—with the civil standard—a preponderance of the evidence—in an effort to "stress[ ] the far higher standard required to convict a defendant in a criminal case." *Id.* at 838, 683 N.E.2d 653. Petitioners argue that such an explanation "advises [the jury] that the proof must be more than a preponderance, but tells them nothing about how much more. A 'clear and convincing standard' could be described exactly the same way, yet this standard is plainly beneath the constitutional threshold of acceptability." Docket No. 14 at 7 in Civil Action 99–10012–REK. In essence, the petitioners argue that the trial judge's reference to a civil standard did little to lend content to the phrase "moral certainty."

As explained above, however, the result of affirming the trial judge's instructions in *Com. v. Payne* is not contrary to the clearly established federal law that states that although jury instructions containing "moral certainty" language may be constitutionally suspect, when that language is set in the context of the charge as a whole, and the charge as a whole roots "moral certainty" in the facts in evidence, and adequately emphasizes "beyond reasonable doubt," the charge survives a Due Process analysis. This is particularly the case, where, as in the charge upheld in *Victor*, the charge instructed the jury that the evidence must "fully convince[ ] you as reasonable persons earnestly seeking the truth." Docket No. 14, Exh. 1 at A3 in Civil Action 98–12000–REK. *Compare Victor*, 511 U.S. at 16, 114 S.Ct. 1239 (affirming a charge that instructs the jury to find the defendant guilty they must be able to say "they feel an abiding conviction . . . of the truth of the charge").

Having concluded that the part of the SJC's decision in *Com. v. Payne* that affirms the trial judge's jury instructions as constitutionally supportable is not contrary to clearly established federal law, I turn next to the second prong of § 2254(d)(1) and consider whether the SJC's decision involves an unreasonable application of clearly established federal law. According to First Circuit precedent, the SJC's decision must be "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it outside the universe of plausible, credible outcome." *O'Brien*, 145 F.3d at 25. In light of the above comparison of the charge in petitioners' case with the charge that was upheld by the Supreme Court in *Victor*, I conclude that the SJC's decision to affirm the trial judge's jury instructions in this instance is "within the universe of plausible, credible outcomes" and therefore survives scrutiny under the second prong of § 2254(d)(1). *Id.*

For these reasons, I conclude that petitioners have not succeeded in their claim that their writs of habeas corpus should issue on the ground that the trial court's jury instructions might have allowed a jury to find the petitioners guilty by a standard less than reasonable doubt.

### V. Analysis of Pre–Trial Eyewitness Identifications

#### A. Introduction

Only Petitioner Michael Payne claims constitutional error by reason of the decision to allow into evidence what Payne asserts to be impermissibly suggestive and unreliable eye-witness identifications. Payne's claim is that his due process rights—the constitutional protection of the evidentiary interest in reliability, and hence a fair trial—were violated when the motion judge, after making the findings of fact that I have recited above in Part I of this Opinion, determined that the pre-trial identifications of the defendant Payne were not required to be excluded from trial. The motion judge also concluded that the identifications of Payne by Anna Bodden, Adrienne Castillo, Charae Chretien and Bree Peterson were not unnecessarily suggestive and were in fact reliable.

Acting consistently with the motion judge's earlier rulings and findings, the trial judge received the identification evidence at trial. The parts of the trial record that are before me contain no recitation of any objection at trial by the petitioners to his doing so.

Petitioners, in their briefs and arguments before me, appear to be assuming that under Massachusetts practice they were bound by the motion judge's rulings and had no right to or opportunity to contend at trial that some or all of the identification evidence should not be received.

I am skeptical that a state procedural rule or practice forbidding a contention before the trial judge, grounded on a proffer of new evidence, for example, or on evidence that a witness would at trial state answers different from those stated before the motion judge, would be constitutionally sustainable. I conclude, nevertheless, that this issue is not one within the scope of my authority to decide in this case. If, by a constitutional requirement, petitioners had a right to present to the trial judge a contention such as this, it was a "use or lose" right that they lost by not asking the trial judge to recognize it.

Rigorously enforcing a timeliness requirement causes a dispute to be decided without reaching the merits. One may argue—and, of course, advocates do so—that when a court acts in this way it exalts form over substance—procedure over the merits. A responsive argument that sometimes wins, however, is that a rigorously enforced timeliness principle is fundamental both to fair process and to avoiding adverse effect on significant substantive rights of the parties. Under this principle, a clearly defined opportunity to present a contention must be exercised at a precisely defined time in the trial proceedings. It is a now-or-never opportunity that a party must, at that precise time, use or lose.

ROBERT E. KEETON, JUDGING IN THE AMERICAN LEGAL SYSTEM 286–87 (1999) (footnotes omitted).

I am guided to this conclusion not only by the "use-or-lose" principle but also by rigorous restraints imposed on federal trial judges in habeas cases by AEDPA and First Circuit precedents to which I refer in other parts of this opinion.

In this instance, the SJC affirmed the motion judge's ruling and the judgment of the trial court that was consistent with it. Payne argues that the decisions by both the motion judge and the SJC involved unreasonable applications of clearly established federal law because neither "appreciated the bedrock principle of the due process analysis" that requires a determination of reliability when assessing the admissibility of identification testimony. Docket No. 14 at 12.

■ The motion judge credited the testimony of Adrienne Castillo and Charae Chretien that recounted that they each identified Michael Payne as one of the shooters before they were exposed to any pre-identification media publicity of the defendants. *See* Findings of Fact as Recited by the Motion Judge for the Purpose of the Suppression Hearing, supra at Part I.B.2. In view of this finding, supportable on the record, I conclude that Payne's case for

federal habeas relief largely evaporates. Such a state court finding of 'basic, primary, or historical facts' based on a credibility determination is 'presumed to be correct,' subject only to rebuttal by 'clear and convincing evidence.' 28 U.S.C. § 2254(e)(1).

*Coombs v. State of Maine*, 202 F.3d at 18. Payne has provided no such rebuttal here.

In Parts B and C below, I proceed to analyze the state court's determinations of the suggestibility and reliability of the pretrial identifications under Supreme Court jurisprudence.

## B. The Supreme Court Jurisprudence

■ The Supreme Court has established a two-prong test to determine when out-of-court identifications may be admitted into evidence against the defendant at trial without violating due process. *See Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). *See also United States v. Maguire*, 918 F.2d 254, 263 (1st Cir.1990). First, a court must determine whether the out-of-court "identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons*, 390 U.S. at 384, 88 S.Ct. 967. The court judges the identification's suggestiveness by the "totality of the circumstance" of the identification procedure. *See id.* at 383, 88 S.Ct. 967.

■ Should a court find that the identification was not suggestive, the court's due process inquiry ends. Should a court find that the identification was impermissibly suggestive, however, the court's analysis advances to the second prong of the *Simmons* two-prong test that looks to the reliability of the challenged identification. *See id.* at 385–86, 88 S.Ct. 967. *See also Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Factors to consider when judging the reliability, nevertheless, of a suggestive identification are:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Manson*, 432 U.S. at 114, 97 S.Ct. 2243 (citing *Biggers*, 409 U.S. at 199–200, 93 S.Ct. 375). Thus, a suggestive identification may nevertheless be admitted against the defendant at trial if a court finds that the identification was in fact reliable. *See*

*id.* *See also United States v. de Jesus–Rios*, 990 F.2d 672, 677 (1st Cir.1993); *United States v. Maguire*, 918 F.2d 254, 263 (1st Cir.1990); *United States v. Bouthot*, 878 F.2d 1506, 1516 (1st Cir.1989).

This *Simmons–Biggers–Manson* line of Supreme Court cases does not point compellingly to a disposition of petitioner's claim in his favor. In applying this line of cases to the circumstances of petitioner's case, I do not conclude that they "require a particular result." *O'Brien*, 145 F.3d at 25. In order to prevail on his claim, petitioner Payne must show that the state court's determination to include the out-of-court identifications at trial was an unreasonable application of the clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1). I conclude that he has failed to do so.

## C. Clearly Established Federal Law in Light of Motion Judge's Decision that Admitting Eye–Witness Identification was Permissible and the SJC's Affirmance in *Com. v. Payne*

The SJC in *Com. v. Payne* upheld the motion judge's determination that the out-of-court identifications were admissible because they were not impermissibly suggestive. *See Com. v. Payne*, 426 Mass. at 694, 690 N.E.2d 443. The SJC did not explicitly reach the issue of reliability, the second prong of the Simmons' two-prong test, because it affirmed the motion judge's determination that (1) the pre-identification media exposure did not invalidate the photographic identification and (2) the photographic array itself, which was shown to the identifying witnesses, was not unduly suggestive.

Petitioner argues that the SJC erred in affirming the motion judge's determination of non-suggestiveness because its conclusion was based on the finding that the "police had nothing to do with the witnesses' exposure to the highly suggestive media images of the petitioner." Docket No. 14 at 13. Petitioner further argues

that because the identifications were suggestive, due to the pre-identification media exposure, the motion judge was required to make a finding of reliability under the clearly established federal law. Petitioner concludes by saying that the SJC therefore erred in affirming the motion judge's determination of admissibility when it did not reach the second prong of the Simmons' two-prong test, "reliability [being] the linchpin in determining the admissibility of identification testimony." *Manson*, 432 U.S. at 114, 97 S.Ct. 2243.

I conclude that petitioner is correct in stating that "federal courts should scrutinize *all* suggestive identification procedures, not just those orchestrated by the police, to determine if they would sufficiently taint the trial so as to deprive the defendant of due process," *Bouthot*, 878 F.2d at 1515 (emphasis added). Petitioner's due process claim nevertheless fails for the following two reasons.

█ . First. The motion judge did not stop at a determination of non-suggestiveness, as petitioner claims, but went further and made a finding of reliability, albeit in a footnote.

> When reviewing motions to suppress identifications, the Supreme Judicial Court applies the unnecessarily suggestive standard set out above. To the extent that the reliability of the identifications is relevant, I find, based on the foregoing findings of fact, that all of the identifications were reliable. *See Commonwealth v. Moon*, 380 Mass. 751, 759, 405 N.E.2d 947 (1980) (rejects reliability test, but encourages Superior Court judges to make findings of reliability).

Docket No. 8 at 76 (Motion Judge's Findings of Fact and Conclusions of Law at 13, n. 2) in Civil Action No. 99–10012–EFH. The findings of fact to which the motion judge refers are those quoted at length above in Part I.C.2, and to which I must defer unless they are rebutted by clear and convincing evidence under 28 U.S.C. § 2254(e)(1). Furthermore, despite petitioner's argument to the contrary, the mo-

tion judge did implicitly rehearse in his lengthy recitation of factual findings, *inter alia*, the reliability factors outlined in *Biggers*, in particular as they relate to Adrienne Castillo and Charae Chretien, the two identifying witnesses who were exposed to media images of the petitioner before identifying a photo of defendant Payne in a photographic array. Without a rebuttal, of which I find none here, the state court's finding of reliability must stand under 28 U.S.C. § 2254(e)(1).

█ Second. The SJC, along with the motion judge, made explicit findings of non-suggestiveness based on both the absence of police manipulation and the mere exposure of media images of the defendants to two of the four identifying witnesses. *See Com. v. Payne*, 426 Mass. at 694, 690 N.E.2d 443; *see* Docket No. 8 at 73–76 (Motion Judge's Findings of Fact and Conclusions of Law). In order to assess the suggestiveness of the identifications, the motion judge reviewed the totality of the circumstances as *Simmons* prescribes. *See* Docket No. 8 at 73 (Motion Judge's Findings of Fact and Conclusions of Law) in Civil Action No. 99–10012–EFH. The motion judge's view of the totality of the circumstances included the fact that the identifying witnesses, in particular Adrienne Castillo and Charae Chretien, saw pictures of the petitioner Payne in the media before they identified him in the photographic array as one of the shooters. *See* Docket No. 8 at 75 (Motion Judge's Findings of Fact and Conclusions of Law) ("Both Adrienne and Charae admitted that they had seen Michael Payne's picture in the media before they identified him ...") in Civil Action No. 99–10012–EFH. The motion judge's view of the totality of the circumstances also included, however, the fact that both Adrienne Castillo and Charae Chretien identified petitioner Payne in the photographic array based on their memories of the night of the shooting and not necessarily from the pre-identification media exposure. *See* Docket No. 8 at 69 (Motion Judge's Find-

ings of Fact and Conclusions of Law at 13, n. 2) (Adrienne Castillo's testimony); *id.* at 72 (Charae Chretien's testimony). In light of the propriety of the photographic arrays displayed to the identifying witnesses and the lack of any evidence of improper manipulation on the part of the police investigators, the motion judge determined that under the totality of the circumstances the identifications were not so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *See Simmons*, 390 U.S. at 384, 88 S.Ct. 967.

The result of the motion judge's decision as well as the SJC's affirmance of it, is not nearly "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes." *O'Brien*, 145 F.3d at 25. For these reasons, Payne's petition for writ of habeas corpus will be denied.

### VI. Petitioner's Request for Evidentiary Hearing

Petitioner requests that this court grant him an evidentiary hearing on the reliability of the identification testimony that was admitted into evidence against him at trial. Under AEDPA's § 2254(e)(2), a habeas petitioner is entitled to an evidentiary hearing under the following circumstances.

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). Both petitioner Payne and respondent agree that because petitioner developed the factual basis of his claim in the state court motion hearing, § 2254(e)(2) does not apply to him.

In these circumstances, Payne has no right to an evidentiary hearing unless he can establish that one existed under the old *Townsend v. Sain* standard, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), as it was modified by *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), and that this standard was not abrogated by AEDPA.

At the outset, I note that the interrelation of 28 U.S.C. § 2254(e)(2) and *Townsend* is a matter of considerable dispute. *See, e.g., Burris v. Parke*, 116 F.3d 256, 258–259 (7th Cir.1997) and *Williams v. Taylor*, 189 F.3d 421 (4th Cir.1999) *cert. granted in part* by — U.S. ——, 120 S.Ct. 395, 145 L.Ed.2d 307 (1999) (NO. 99–6615). I conclude, however, that I need not probe that dispute because, in any event, petitioner Payne cannot satisfy the prerequisites for invoking Townsend.

*Townsend* declares that

[w]here the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding. In other words a federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts.

*Martineau v. Perrin*, 601 F.2d 1201, 1207 (1st Cir.1979) citing *Townsend*, 372 U.S. at 312–13, 83 S.Ct. 745. In particular, *Townsend* mandates a hearing in the following cases

If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a

whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Townsend,* 372 U.S. at 313, 83 S.Ct. 745. "In all other cases ..., the holding of such a hearing is in the discretion of the district judge." *Id.* at 318, 83 S.Ct. 745. *See also Amanullah v. Nelson,* 811 F.2d 1, 16 (1st Cir.1987). (*Keeney v. Tamayo–Reyes* partially overruled *Townsend* on a raise or waive rule that is not relevant here. *See* 504 U.S. 1, 5, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). *See also Thompson v. Keohane,* 516 U.S. 99, 109 n. 8, 116 S.Ct. 457, 133 L.Ed.2d 383.)

Petitioner claims that the findings of fact that are in dispute and that would be the subject of the evidentiary hearing before me are not findings of historical fact, the kind to which a federal court applying *Townsend* must give deference. Instead, petitioner claims that the motion court's ruling—whether an identification is reliable despite exposure to an allegedly suggestive identification procedure—is a "classic example" of a mixed question of law and fact. *See* Docket No. 14 at 18. I accept petitioner's point that the motion judge did apply a legal standard to a factual context found by the motion judge, and thus made a legal-factual determination the result of which was to allow the identifications at trial. Petitioner is not correct, however, in asserting that the facts to be found should I grant an evidentiary hearing, would not be "basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators ..." *Townsend,* 372 U.S. at 309 n. 6, 83 S.Ct. 745. These are precisely the kind of facts that the motion judge found in order to reach his legal-factual

determination and they are the facts covered by the presumption of correctness under *Townsend* and, more stringently, under the 1996 amendments of 28 U.S.C. § 2254. *See* 28 U.S.C. § 2254(e)(2) (1996).

The motion judge's determination as to the credibility of the testimony of eyewitnesses describing petitioner Payne as one of the shooters and as to the sequence of the events, cannot be disturbed by this federal court's review under § 2254. *See* 28 U.S.C. § 2254(e)(2). In this respect, the case before me is not materially like *Thompson v. Keohane,* 516 U.S. 99, 110–11, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (discussing the spectrum of cases that would be and would not be entitled to the presumption of correctness under § 2254 and acknowledging that Supreme Court jurisprudence "has not charted an entirely clear course in this area"). *See also Miller v. Fenton,* 474 U.S. 104, 114, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (when an "issue involves the credibility of witnesses and therefore turns largely on an evaluation of demeanor, there are compelling and familiar justifications for leaving the process of applying law to fact to the trial court"). Furthermore, because I have determined in Part V above that the result of allowing consideration at trial of evidence of the eye-witness identification is not an unreasonable application of federal law (based on the facts found after a fair and full hearing before the motion judge), I conclude that an evidentiary hearing in this federal district court to cover the same ground is not warranted.

### ORDER

For the reasons stated in the foregoing Opinion, it is ORDERED:

(1) Petitioner Marcus Edward's Petition for Writ of Habeas Corpus (Docket No. 1 in Civil Action No. 98–12000–REK) is DISMISSED;

(2) Petitioner Michael Payne's Petition for Writ of Habeas Corpus (Docket No. 1

in Civil Action 99–10012–EFH) is DISMISSED;

(3) Petitioner Michael Payne's Request for Evidentiary Hearing (Docket No. 14 in Civil Action No. 99–10012–REK) is DENIED.

(4) The Clerk is directed to enter forthwith on a separate document a Final Judgment of dismissal in each of these two cases.

### Final Judgment

For the reasons stated in the Opinion of this date, it is hereby ORDERED:

This case is dismissed.