## COMMONWEALTH *vs.* LONNIE WATKINS.

Suffolk. February 4, 1997. - August 27, 1997.

Present: WILKINS, C.J., LYNCH, O'CONNOR, FRIED, & MARSHALL, JJ.

*Practice, Criminal,* Instructions to jury, Voluntariness of statement, Reasonable doubt, Deliberation of jury, Capital case. *Evidence,* Admissions and confessions. *Jury and Jurors. Joint Enterprise. Homicide. Search and Seizure,* Warrant. *Constitutional Law,* Search and seizure.

This court declined to expand the humane practice with respect to a criminal defendant's statements to police to require the jury to agree unanimously beyond a reasonable doubt that such statements are voluntary before they can be considered as evidence. [834-836]

At a murder trial, the judge's instructions to the jury on proof beyond a reasonable doubt contained no error. [836-839]

At the trial of indictments for murder and armed robbery, tried on a theory of joint venture, the judge was not required to instruct for a third time in a second supplemental instruction on the issue of withdrawal from a joint venture, particularly where the jury had not asked about that issue in its second question. [839-841]

Police executing an arrest warrant for a defendant at an apartment where he lived, who were permitted to enter and conduct a protective sweep and who waited for a search warrant before conducting a search and seizing evidence, acted lawfully, and the defendant's motion to suppress the items seized was correctly denied. [841-842]

INDICTMENTS found and returned in the Superior Court Department on April 9, 1993.

Pretrial motions to suppress evidence were heard by *Sandra L. Hamlin,* J., and the cases were tried before *John F. Moriarty,* J.

*Robert L. Sheketoff* for the defendant.

*Jane A. Sullivan,* Assistant District Attorney, for the Commonwealth.

MARSHALL, J. On June 28, 1994, Lonnie Watkins was convicted by a jury on two indictments charging armed robbery, G. L. c. 265, § 17, and two indictments charging murder in the first degree by reason of extreme atrocity or cruelty and felony-

murder, G. L. c. 265, § 1. The trial judge in the Superior Court sentenced Watkins to two concurrent terms of life imprisonment on the murder convictions, and two terms of from fifteen to twenty years on the armed robbery convictions.[1]

Watkins appeals from these convictions. He maintains that the judge erred by permitting jurors to decide individually, rather than unanimously as a jury, whether the Commonwealth had proved beyond a reasonable doubt that Watkins's pretrial statement to the police was voluntary. Watkins also argues that the judge's instructions to the jury on proof beyond a reasonable doubt and on joint venture were erroneous and violated his constitutional rights. He further contends that his motion to suppress evidence seized from his home was incorrectly decided in violation of his rights under the Fourth Amendment to the United States Constitution, and arts. 14 and 12 of the Massachusetts Declaration of Rights. We affirm the convictions.

1. On the evening of March 27, and the early morning of March 28, 1993, Watkins and several friends attended a birthday party at a house in the Dorchester section of Boston. Also attending the party were the victims, Lloyd Industrious and Kevin Christopher.[2] Christopher was wearing two large gold chains around his neck. At some point during the evening, Watkins and at least three of his friends decided to steal a chain from Christopher. They later agreed that they would wait until the party was over before doing so. Ana Bodden, who was also a guest at the party, testified that an hour before it ended, Watkins, Payne, and Anderson together had shown her guns that each had; Watkins's gun was under his shirt.

The party ended at around 3:45 A.M. on March 28, 1993, when guests began to leave. Parked across the street from the house was a white Mitsubishi automobile that Industrious and Christopher had driven to the party. Parked behind the Mitsubishi was a Ford Taurus automobile in which six other guests who were leaving the party were passengers. A driveway separated the two automobiles. Bodden was in the front passenger seat of the Taurus.

---

[1]Watkins was found not guilty of unlawful possession of a firearm, G. L. c. 269, § 10 (*a*).

[2]Among those identified as attending the party with Watkins were Mark Anderson, Marcus "Pooky" Edwards, and Michael Payne. Prior to Watkins's trial, Anderson, Edwards, and Payne also were prosecuted for the robbery and murder of Kevin Christopher and Lloyd Industrious. Anderson was tried as a juvenile. Edwards and Payne were convicted, and their appeals are pending.

Bodden testified that shortly before the shooting, Edwards was standing on the sidewalk, talking to the driver of the Taurus, Charae Chretien. While Chretien and Edwards were talking, Bodden heard gunshots. She saw Watkins, Payne, and Anderson shooting at Christopher and Industrious who were on the ground. Bodden observed someone shoot Industrious as he attempted to stand up; she testified that she thought that Payne was the person shooting at Industrious. She identified Watkins and Anderson as the two who shot Christopher. When the shooting stopped, the men turned and ran down the street past the Ford Taurus. Bodden saw Anderson grab a chain from Christopher and saw Edwards take a chain from Industrious.

Later that day, Boston police detectives questioned Bodden at the home of her aunt. She told the detectives that Watkins, Edwards, Anderson, and "Chris" were the men whom she had seen shoot Christopher and Industrious,[3] and she gave the police descriptions of Edwards, Anderson, and Watkins. The following day, in a subsequent interview, Bodden was shown a book of photographs; she picked out photographs of Anderson, Edwards, Watkins, and a man she referred to as "Derek"[4] as those who had been at the party.

Another passenger in the Ford Taurus, Adrian Castillo, also testified at Watkins's trial. She testified that after the party, as she and her friends were sitting in the Taurus, and shortly after Edwards spoke to Chretien, she heard noises that sounded like firecrackers. When she looked up she saw Payne, Edwards, and another man whose back was toward her, shooting at Christopher. She saw a man over six feet tall standing alone near the sidewalk side of the automobile[5]; she said she saw sparks from that side of the automobile. After the shooting stopped, Castillo said she saw the men run down the street; Edwards turned around and snatched a chain from the neck of one of the victims.

The medical examiner who performed autopsies on Christo-

---

[3]Other witnesses identified a man named "Chris" as having attended the party and participating in the shooting of the two victims. The police never interviewed anyone named "Chris" in connection with the murders. At trial, on cross-examination, Bodden denied that she had identified "Chris" as one of the men who had shot Christopher and Industrious.

[4]Bodden testified that she did not see "Derek" shoot anybody. Watkins told police that a man named "Derek" drove him and others away after the shooting had occurred. Lieutenant Horsley of the Boston police department testified that the man Bodden identified as "Derek" was Derek Jones.

[5]Watkins told police that he was six feet, five inches tall.

pher and Industrious testified that both men had died from multiple gunshot wounds. A police ballistics expert testified that at least four different guns had been used to shoot Christopher and Industrious: two nine millimeter semiautomatic handguns, a .25 caliber semiautomatic pistol, and a revolver, either .38 or .357 caliber.

As a result of the information provided to them, on March 30, 1993, Boston police obtained arrest warrants for four suspects, including Watkins. Lieutenant Detective Timothy Murray, Detective John Brasil, Officer Kenneth Dortch, and two other police officers were assigned to arrest Watkins at 44 Havelock Street where Watkins was believed to reside.

The building at 44 Havelock Street is a three-story dwelling, with a different apartment on each floor. At around 4 P.M. when the police arrived at that address, they had an arrest warrant for Watkins, but they did not know in which apartment he lived. The police entered the building through an unlocked door and spoke, first, to a resident of the first-floor apartment who informed them that Watkins lived in the second-floor apartment. At the second-floor apartment, Watkins's grandmother confirmed that Watkins resided there, but had left shortly before the police arrived. She allowed the police to enter the apartment, and they then conducted a protective sweep.[6] Murray testified that after she allowed the police into the apartment, they conducted a protective sweep to see if Watkins was there. After the police determined that Watkins was not present, they informed his grandmother that they wanted to wait in the apartment for him and to ensure that no evidence was removed or destroyed until they had obtained a search warrant.

Between 4:30 or 5 P.M., after the premises had been secured, Murray left to obtain the search warrant; the other police officers remained at the apartment. At about 11:45 P.M., Murray returned with a search warrant, and the police then conducted the search of the entire apartment. The police removed from Watkins's bedroom a gun cleaning kit, a shotgun shell, three .22 caliber live rounds of ammunition, two nine millimeter live rounds of ammunition, and personal papers.

Meanwhile Watkins had arrived back at the apartment around

[6]Lieutenant Murray testified that, when Watkins's grandmother told the police he had left shortly before they arrived, they informed her that they had to speak to Watkins, and wanted to enter the apartment to make sure that he was not there.

7 p.m.; he was arrested. Later that night, while in police custody, Watkins was interrogated about the robbery and murders of Christopher and Industrious.

2. Watkins challenges the judge's supplemental instructions, given in response to the jury's inquiry about the burden of proof required to evaluate the voluntariness of Watkins's statements to the police. At trial a tape recording of Watkins's interrogation by the police on the night he was arrested was played to the jury.[7] The judge instructed the jury twice — when they initially heard the recording and again when he gave his instructions immediately prior to deliberations — that, before considering Watkins's statement, the jury must be satisfied beyond a reasonable doubt that the statement was voluntary. These instructions were given pursuant to our humane practice. See *Commonwealth* v. *Tavares*, 385 Mass. 140, cert. denied, 457 U.S. 1137 (1982).

After some hours of deliberation, the jury returned with a question regarding the voluntariness of Watkins's statement: did their decision to use the tape-recorded statement have to be unanimous? Watkins's attorney requested that the judge answer the jury's question in the affirmative. Apparently understanding that the judge would not grant that request,[8] Watkins's attorney suggested, in the alternative, that the judge instruct the jury that each juror individually should determine whether Watkins's statement was given voluntarily to the police; if a juror was not convinced beyond a reasonable doubt that the statement was voluntary, that juror should not use the statement as evidence in coming to his or her own conclusion as to whether the Commonwealth had proved the charged crimes beyond a reasonable doubt. The judge adopted this latter suggestion of defense counsel, and instructed the jury accordingly. Counsel noted his objection.

We conclude that the judge's supplemental instructions were correct and that he was not required to instruct the jury that they had to decide unanimously that Watkins's statement was voluntary before any juror could consider it. Our humane practice requires that, before a defendant's statement may be admitted in evidence, there must be a preliminary hearing at

---

[7]Before trial, Watkins moved to suppress statements on the grounds that they were not voluntary. After a hearing, a judge denied Watkins's motion.

[8]The record does not reflect the source of counsel's statement on the record that the judge had "indicated" that he would not so instruct the jury.

which the Commonwealth must persuade a judge beyond a reasonable doubt that the statement was voluntary. If the statement is later admitted at trial, and if voluntariness is a live issue, the judge must instruct the jury "that the Commonwealth has the burden of proving beyond a reasonable doubt that the statement was voluntary and that the jurors must disregard the statement unless the Commonwealth has met its burden." *Commonwealth* v. *Tavares, supra* at 151-152. The second of this two-part inquiry — requiring the jury to find that the Commonwealth has met its burden that the defendant's statement was voluntary — is not constitutionally mandated. See *Commonwealth* v. *Cole,* 380 Mass. 30, 40 (1980). We have upheld convictions in which the trial judge failed to remind the jury specifically of their duty to find a defendant's statement voluntary beyond a reasonable doubt, as long as the jury had been generally instructed that the Commonwealth always bore the burden of proving its case beyond a reasonable doubt. See *Commonwealth* v. *Doucette,* 391 Mass. 443, 457 (1984); *Commonwealth* v. *Benoit,* 389 Mass. 411, 421 (1983).

The requirement that there be a two-part inquiry about the voluntariness of a defendant's statement, and the heavy burden of proof required of the Commonwealth before the statement can be considered as evidence, is the result of a long evolution of jurisprudence in this Commonwealth. In *Commonwealth* v. *Morey,* 1 Gray 461 (1854), Chief Justice Lemuel Shaw first expressed our concern about the use of a defendant's confession as evidence: a defendant "may be induced, by the pressure of hope or fear, to admit facts unfavorable to him, without regard to their truth, in order to obtain the promised relief, or avoid the threatened danger, and therefore admissions so obtained have no just and legitimate tendency to prove the facts admitted." *Id.* at 462-463. In *Commonwealth* v. *Culver,* 126 Mass. 464 (1879), we held that, before a defendant's confession could be admitted in evidence, a defendant had the right to a preliminary hearing before a judge to determine the competency of such evidence, and the right later to ask the jury to disregard the confession. *Id.* at 466. We later expanded this humane practice to include any inculpatory statement made by a defendant. *Tavares, supra* at 150, and cases cited.

For many decades our humane practice required that the Commonwealth prove the voluntariness of a defendant's statement by a preponderance of the evidence. See *Commonwealth*

v. *Dyke*, 394 Mass. 32, 36 (1985); *Commonwealth* v. *Mahnke*, 368 Mass. 662, 680 (1975), cert. denied, 425 U.S. 959 (1976), and cases cited. In *Tavares*, we determined that the jury had to be satisfied beyond a reasonable doubt that the defendant had made a statement voluntarily.

Watkins now urges us to expand further our humane practice, and to require that the jury as a whole must agree unanimously beyond a reasonable doubt that a defendant's statement is voluntary before it can be considered as evidence. We are not inclined to do so. The humane practice is necessary because of the "prejudice inhering in the admixture of a determination of voluntariness together with the jury's inescapable consideration of reliability of the confession, and indeed ultimate guilt or innocence." *Tavares, supra* at 151-152, quoting *Clifton* v. *United States*, 371 F.2d 354, 362 (D.C. Cir. 1966) (Leventhal, J., concurring), cert. denied, 386 U.S. 995 (1967). However, nothing in the development of our humane practice compels us to take the step of imposing a unanimity requirement. In a criminal trial the jury verdict as to each charge brought by the Commonwealth must be unanimous. See, e.g., *Commonwealth* v. *Berry*, 420 Mass. 95, 111 (1995); *Commonwealth* v. *Hebert*, 379 Mass. 752, 754 (1980); *Commonwealth* v. *Nadal-Ginard*, 42 Mass. App. Ct. 1, 12 (1996). We have not extended this unanimity requirement further, and we see no reason to compel the requirement to encompass the admission of a defendant's pretrial inculpatory statement. In this case the judge emphasized to the jury that they had the duty to find Watkins's statement voluntary beyond a reasonable doubt before they could consider the statement as evidence. This is all that is required.

3. Watkins challenges the judge's instruction to the jury regarding proof "beyond a reasonable doubt."[9] He argues

---

[9]The judge gave the following instructions on reasonable doubt:

"Now, the presumption of innocence means that all right, but it also means a great deal more than that. The presumption of innocence also means that no one charged with having committed a crime must prove his or her innocence. Quite the contrary is true. The Commonwealth, the government must prove his or her guilt and must prove it beyond any reasonable doubt. And it's the absolute right of every one of us, that includes all of you, it includes me, and it includes Lonnie Watkins over there, if charged with crime, to simply come to court, plead not guilty, and then say to the Commonwealth, to the govern-

specifically that the charge that beyond a reasonable doubt means "to a moral certainty" was severed from any language stressing the high degree of certainty required to convict a defendant and "gutted the connections" to other language that we repeatedly have approved from *Commonwealth* v. *Webster*, 5 Cush. 295 (1850).

When reviewing a jury instruction to determine whether the charge impermissibly lowers the Commonwealth's burden of proof, the question is "whether a reasonable juror could have used the instruction incorrectly." *Commonwealth* v. *Rosa*, 422 Mass. 18, 27 (1996). In determining the propriety of such instructions, we consider the charge as a whole, "and not from a consideration of isolated portions." *Commonwealth* v. *Lanoue*, 392 Mass. 583, 591 (1984). See *Victor* v. *Nebraska*, 511 U.S. 1,

---

ment, now you prove it. And say absolutely nothing else, if we wish.

"The burden then rests upon the Commonwealth to prove each essential element of the crime that has been charged and to prove it beyond any reasonable doubt. Now, I've stressed that expression, beyond any reasonable doubt. I've done that very deliberately, because that is the second, but equally important part of this concept. What precisely does that mean?

"Just by way of contrast. If the other day when you came here to court to serve your jury duty you had been selected to sit on the trial of a civil case rather than a criminal case, you probably would have learned in the court of such a trial that in a civil case one side or the other has the burden of proving facts by what we call a fair preponderance of evidence, which really means only to prove that a given fact is more likely, more probable than not. That's the standard in a civil case.

"In a criminal case, and this is a criminal case, the burden that rests on the government is much greater than that. To simply prove in a criminal case that the defendant is more probably guilty than not is not nearly enough. In a criminal case the facts must be proved beyond a reasonable doubt. That means to a moral certainty. Anything less than that degree of conviction upon a particular charge would mean that the Commonwealth had not proved its case, and the defendant would be entitled to an acquittal.

"Now a word of caution, however. Proof beyond reasonable doubt does not mean proof beyond all doubt or an imaginary doubt. A reasonable doubt, for example, is not the doubt that might exist in the mind of a man or a woman searching for some doubt, for some excuse to acquit a defendant. It does not mean that. And it does not mean absolute proof or proof to a mathematical certainty, if indeed there is such a thing as mathematical certainty. What it does mean is such proof as fully convinces you as reasonable persons now earnestly seeking the truth that the defendant is guilty.

"But if after all is said and done there remains in the minds of the jury any reasonable doubt as to the existence of any fact or facts necessary to a conviction upon the particular charge, than it becomes the duty of the jury to resolve that doubt in favor of the defendant and to find him not guilty."

16 (1994).[10] Viewing the charge as a whole, we conclude that there was no error in this instruction.

First, the judge contrasted the heavy burden of proof resting on the Commonwealth in a criminal case with the "fair preponderance of the evidence" standard applicable in civil cases, emphasizing that the Commonwealth's burden is "much greater than" the civil standard, and that "[t]o simply prove in a criminal case that the defendant is more probably guilty than not is not nearly enough." That contrast provided the jury with the context to understand the concept of reasonable doubt, and stressed the far higher standard required to convict a defendant in a criminal case.[11] In addition, the judge emphasized to the jury that proof beyond a reasonable doubt means "such proof as *fully convinces you* as reasonable persons . . . that the defendant is guilty" (emphasis added). This instruction is akin to the "abiding conviction" phrase used in *Webster* and "impressed upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused." *Com-*

---

[10]If the language challenged, considered in isolation, could have led a reasonable juror to have misunderstood or lowered the Commonwealth's burden of proof, we then review the charge as a whole to determine whether the infirm language is sufficiently explained or clarified and whether the entire charge delivered a correct interpretation of the law. *Francis* v. *Franklin*, 471 U.S. 307, 313 (1985). *Commonwealth* v. *Torres*, 420 Mass. 479, 489 (1995). There is no claim here that the specific language challenged itself could have been understood by a reasonable juror to lower the Commonwealth's burden. With reference to a judge's use of the phrase "moral certainty," we have said that "[u]nless the judge uses the words in isolation, their use presents no problem," *Commonwealth* v. *Beldotti*, 409 Mass. 553, 562 (1991), and "we have upheld the use of the moral certainty language in a reasonable doubt instruction if it is linked with language that lends content to the phrase." *Commonwealth* v. *Pinckney*, 419 Mass. 341, 345 (1995).

[11]In his instructions the judge also emphasized that the defendant was presumed innocent and that the Commonwealth had the burden of proving each element of the crime beyond any reasonable doubt, and that "[a]nything less than that degree of conviction as to any fact or facts that's necessary to a conviction upon a particular charge would mean that the Commonwealth had not proved its case, and the defendant would be entitled to an acquittal . . . . [I]f after all is said and done there remains in the minds of the jury any reasonable doubt as to the existence of fact or facts necessary to a conviction upon the particular charge, then it becomes the duty of the jury to resolve that doubt in favor of the defendant and to find him not guilty." This language "clearly informed the jurors that the Commonwealth had the burden of producing evidence and the burden of proof to persuade the jury to this high degree of certainty." *Commonwealth* v. *Gagliardi*, 418 Mass. 562, 571-572 (1994), cert. denied, 513 U.S. 1091 (1995).

*monwealth* v. *Pinckney*, 419 Mass. 341, 344 (1995). See *Commonwealth* v. *Seay*, 376 Mass. 735, 746 (1978) (upholding instruction defining proof beyond reasonable doubt "in terms of 'moral certainty' and 'clear and settled conviction' "). Both the context in which the phrase "moral certainty" was used, and the judge's further elaboration of reasonable doubt as "such proof as fully convinces you as reasonable persons," used with the term "moral certainty," was sufficient to convey to the jury the requisite degree of certainty required for conviction.

Watkins also argues that it was error for the judge to cast the definition of reasonable doubt in negative terms by instructing the jury that reasonable doubt "is not the doubt that might exist in the mind of a man or a woman searching for some doubt, for some excuse to acquit a defendant." We disagree. In *Commonwealth* v. *Seay*, 376 Mass. 735 (1978), we upheld a jury instruction that contrasted reasonable doubt with the doubt of a person "who is seeking a doubt or an excuse to acquit the defendant." *Id.* at 746. See *Commonwealth* v. *Randolph*, 415 Mass. 364, 367 (1993) (language instructing jury "not to search for doubt" is not erroneous); *Commonwealth* v. *Lanoue, supra* at 590-591 (judge's definition of "reasonable juror" as one "earnestly seeking the truth and not looking for a doubt" is permissible). No reasonable juror could have misunderstood these instructions (heard in the context of the judge's other specific instructions that proof beyond a reasonable doubt is "such proof as fully convinces you as reasonable persons now earnestly seeking the truth") as permitting conviction on proof less than beyond a reasonable doubt. There was no error.

4. Watkins next argues that the judge erred in his supplemental instruction to the jury on joint venture. The jury sent two separate inquiries to the judge regarding joint venture. The first question asked what constituted withdrawal from a joint venture, and requested a definition of joint venture. The judge reinstructed the jury on joint venture and on withdrawal, emphasizing that the Commonwealth had the burden of proving beyond a reasonable doubt that a joint venture existed, that there was a joint venture to commit the crime, *and* that the defendant did not withdraw from the joint venture.

A few hours later, the jury returned with a further question regarding joint venture; this time they asked, "Considering the joint venture clause and the relationship of malice to murder, is it contradictory to find someone guilty of armed robbery, but

not guilty of murder, if the robbery results in the victim's death." The judge then instructed the jury, in summary, that a defendant, whether armed or not, who participated in an armed robbery with knowledge that a coventurer was armed, was responsible for the actions of others engaged in the armed robbery. The judge also instructed the jury that the armed robbery provided the malice necessary for a conviction of murder in the first degree. At the conclusion of these supplemental instructions, the judge reminded the jury that they were required to consider each of the indictments separately. Watkins argues that these instructions removed from the jury the issue of withdrawal.[12] We do not agree, nor do we conclude that the judge should have instructed the jury a third time on the issue of withdrawal.

We presume that a jury follow all instructions given to it, *Commonwealth* v. *Albert*, 391 Mass. 853, 859 (1984); "the law does not require repetition of the same thought at each turn." *Commonwealth* v. *Peters*, 372 Mass. 319, 324 (1977). The necessity, scope, and character of a judge's supplemental jury instructions are within his or her discretion. *Commonwealth* v. *Thomas*, 21 Mass. App. Ct. 183, 186 (1985), quoting *United States* v. *Castenada*, 555 F.2d 605, 611 (7th Cir.), cert. denied, 434 U.S. 847 (1977). As we observed in *Commonwealth* v. *Waite*, 422 Mass. 792, 807 n.11 (1996):

> "The proper response to a jury question must remain within the discretion of the trial judge, who has observed the evidence and the jury firsthand and can tailor supplemental instructions accordingly. A jury that has engaged in some deliberations generally have focused their inquiry, and it serves the interests of justice for any supplemental instruction to help hone that inquiry, furthering the difficult task of coming to a unanimous verdict."

Considering the judge's initial and supplemental instructions as a whole, we conclude that they did not direct the jury to find Watkins guilty of murder in the first degree if they found him

---

[12]Watkins says that the judge should have responded to the final question from the jury by instructing that it is not contradictory to find someone guilty of armed robbery, but not guilty of murder, because of the doctrine of withdrawal.

guilty of robbery, as Watkins argues. We also do not agree that the jury's verdict of not guilty on the charge of possession of a firearm is somehow indicative that they did not understand the concept of withdrawal.

It is undisputed that Watkins knew that his coventurers were carrying guns, and the judge correctly instructed the jury that Watkins was "responsible for the others engaged in that armed robbery, provided that he himself has actual knowledge and knows that the co-venturer is armed with a gun and has the same specific intent." See *Commonwealth* v. *Fickett*, 403 Mass. 194 (1988) (to support conviction of murder on theory of joint venture Commonwealth must prove that defendant knew that co-venturer had gun with him). The last instruction the judge gave the jury before they returned to their deliberations was that they were required to take each indictment and consider it separately. Given this reminder, and the judge's instructions on withdrawal in both his primary jury instructions and his first set of supplemental instructions,[13] we conclude that there is no risk that the jurors did not understand that they were required to assess guilt for each crime separately. See *Commonwealth* v. *Galford*, 413 Mass. 364, 375 (1992), cert. denied, 506 U.S. 1065 (1993).

5. Watkins next argues that his constitutional rights under the Fourth Amendment and art. 14 were violated when the judge denied his motion to suppress evidence obtained from his apartment on March 30, 1993.

When police enter a dwelling for the purpose of arresting a suspect, ordinarily they must have a warrant. *Commonwealth* v. *Pietrass*, 392 Mass. 892, 897 (1984). The United States Supreme Court has held that under the Fourth Amendment an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within; a separate search warrant is not required. *Payton* v. *New York*, 445 U.S.

---

[13]We note that in its final question to the judge, the jury did not ask about withdrawal as they had done in their earlier question. On two occasions — once in response to a specific question from the jury — the judge had correctly instructed the jury on withdrawal. The judge was required to answer only the specific question asked of him in their last question. See *Commonwealth* v. *Waite*, 422 Mass. 792, 807 n.11 (1996).

573, 603 (1980).[14] Watkins argues that the entry into his apartment and the protective sweep were unlawful because the police did not possess the requisite reason to believe that he was present in the apartment as required by *Payton, supra.* We need not resolve that issue because there is no showing in this case that the evidence sought to be suppressed was the "exploitation" of any prior illegality. *Commonwealth* v. *Blake*, 413 Mass. 823, 830 (1992).[15] The record shows that, except for the initial protective sweep,[16] the police refrained from searching the apartment until the police had obtained the search warrant later that evening. No information obtained in entering the apartment or in the protective sweep was used to secure the search warrant; the only information that the police did not have before they arrived at 44 Havelock Street was the number of Watkins's apartment. That information was obtained from the resident of the first-floor apartment. It was confirmed by Watkins's grandmother before the officers entered Watkins's apartment. The police secured the area to be searched while they waited for the requisite search warrant, and did not commence the search before the warrant was issued and delivered to the waiting officers. This was permissible. *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 742 (1990). See *Commonwealth* v. *Acosta*, 416 Mass. 279, 283 (1993). Because the search warrant "was not tainted by the warrantless search of the apartment," *Commonwealth* v. *Alvarez*, 422 Mass. 198, 211 (1996), Watkins's constitutional rights were not violated. The fruits of the police search of Watkins's apartment were admissible in evidence.

6. We have reviewed the entire record pursuant to G. L. c. 278, § 33E, and find no additional reason to exercise our power either to reduce the murder verdicts or order a new trial. Accordingly, we affirm Watkins's two convictions of armed robbery in violation of G. L. c. 265, § 17, and two convictions

---

[14]We have not determined whether art. 14 affords greater rights than those recognized under the Federal Constitution. *Commonwealth* v. *Acosta*, 416 Mass. 279, 282 (1993).

[15]For the same reason we need not consider the reasonableness of the "freezing" of the apartment by the police while they obtained a search warrant.

[16]A search of a suspect's dwelling for the limited purpose of insuring the safety of the police and to search for weapons is permitted. See *Commonwealth* v. *Bui*, 419 Mass. 392, 395, cert. denied, 516 U.S. 861 (1995).

of murder in the first degree by reason of extreme atrocity or cruelty and felony-murder, in violation of G. L. c. 265, § 1.

*So ordered.*