## Commonwealth vs. William R. Riley.

Plymouth. December 8, 2000. - January 25, 2001.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, & Sosman, JJ.

*Practice, Criminal,* Instructions to jury, Reasonable doubt. *Homicide. Malice.*

At the trial of an indictment for murder in the second degree, there was sufficient evidence that the defendant knew the gun he fired at the victim's head was loaded, that is, he knew there was a plain and strong likelihood that death would follow from his act, to support the defendant's conviction. [268-270]

At the trial of a murder indictment, the judge's instructions to the jury were constitutionally sufficient even with the omission of the "strong probability" language of *Commonwealth* v. *Webster,* 5 Cush. 295, 320 (1850). [271-272]

At a criminal trial, the judge was not required to instruct that the degree of certainty required to convict is "unique to the criminal law." [272]

At a criminal trial, the judge's instructions on reasonable doubt were not insufficient. [272-273]

This court declined to abolish third prong malice. [273]

Indictment found and returned in the Superior Court Department on November 4, 1996.

The case was tried before *Charles F. Barrett,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Bruce Ferg,* Committee for Public Counsel Services, for the defendant.

*John E. Bradley,* Assistant District Attorney, for the Commonwealth.

Ireland, J. The defendant, William R. Riley, was convicted of murder in the second degree. On appeal, he claims that the trial judge erred in (1) denying his motion for a required finding of not guilty as to the charge of murder in the second degree on the ground that there was insufficient evidence of malice; and (2) instructing the jury on reasonable doubt. The defendant also argues that third prong malice should be abolished as a basis for

murder in the second degree. We granted the defendant's application for direct appellate review. Because the verdict rested on sufficient evidence and the jury instructions were adequate, we affirm the conviction.

1. *Background.* The defendant lawfully owned a nine millimeter semiautomatic pistol that he kept in his Brockton apartment. In general, he knew how to handle the firearm and was familiar with its operation. Having completed a National Rifle Association safety course, the defendant was schooled in the proper way to load and unload semiautomatic weapons. The defendant generally carried his weapon, loaded, "most of the time when he went out," and he regularly attended a local gun club. In addition, the defendant disassembled and reassembled the gun "about every other day."

On June 10, 1992, he invited the victim, John E. Nelson, to his apartment. Two boys, Douglas Bonebrake (then sixteen years old) and his half-brother Daniel Craig (then fourteen years old), lived with the defendant and witnessed the events leading up to the victim's death. At some point, the victim asked to see the defendant's gun. After unloading the gun, the defendant handed it to the victim. The victim looked at the gun for a few minutes and handed it back to the defendant. At this time, the defendant reloaded the gun, in such a way that he allowed a "live round into the chamber." Both witnesses testified that, on previous occasions, they had often watched the defendant load and unload his weapon, but never in the manner he used immediately before the victim was shot. When the victim again asked to see the gun, the defendant showed it to him and, according to Bonebrake, asked the victim, "Are you ready?"[1] After the victim replied "Yeah," the defendant pointed the gun at the victim's forehead, holding the barrel at a distance of about two to three inches.[2] Bonebrake repeatedly warned the defendant, yelling "loud enough that [the defendant] could hear," that there was still one round "in there, in the chamber." The defendant ignored the warning and told Bonebrake to "shut up." Craig, the other eyewitness, also knew the gun contained a live round and repeatedly told the defendant so in a "concerned voice." Again, the defendant refused to listen, telling the boys that he knew his gun.

---

[1] On cross-examination Bonebrake testified that the defendant asked, "Do you dare me?," and the victim responded, "Yes."

[2] There was evidence that on prior occasions the defendant had similarly placed his firearm to someone else's head.

The defendant pulled the trigger, the boys heard a "loud bang," and the victim dropped to the floor. After the shot, the defendant washed off the gun and ordered Bonebrake, "in an angry tone," to "tell the police department that it was an accident, [that the victim] shot himself." If Bonebrake did not corroborate the accident story, the defendant warned Bonebrake that he would be next. Similarly, the defendant threatened Craig that, unless he told the police the accident story, he and his family would be killed.

When the police arrived at the scene, they found the gun on the kitchen stove. In his statement to the police, the defendant related that, after leaving his bedroom, he heard a shot and returned to find the victim lying against the bureau with a head wound. At the station, the boys, mindful of the defendant's threats, gave separate statements explaining that the victim had shot himself.

In the summer of 1996, the defendant related a new version of an old story to a friend. In the course of their discussion, the defendant described the incident as follows: "[The victim] had been playing around with his gun and [the defendant] didn't like it. And [the defendant] went up to [the victim]. . . . [The defendant] said that he didn't realize that he had chambered a round. And when [the defendant] pulled the trigger a bullet was expelled [into the victim's forehead]." A few months later, a State police sergeant reinterviewed the boys (September 14, 1996) and the defendant (September 27, 1996). After receiving his Miranda rights, the defendant initially recalled that the victim was "fooling around" with the weapon and that his attempt to grab the gun caused the firing of the fatal shot. After further discussion, the defendant modified his version of events, stating the victim was "fooling around with the gun" and said, "I want to die anyway." The defendant picked up the handgun; the victim "brought the barrel of the gun up to his forehead"; and then, "without [his] realizing it, the gun went off." The defendant gave a recorded statement to this effect.

On November 4, 1996, a grand jury returned an indictment charging the defendant with murder in the second degree. At trial, the jury rejected the defendant's "accident" defense, i.e., that in his mind he had unloaded the gun and it was safe. A guilty verdict was returned on the indictment.

2. *Motion for a required finding.* At the close of the evidence, the defendant moved for a required finding of not guilty, claim-

ing that the evidence supported a verdict of involuntary manslaughter, but not murder in the second degree. In denying the motion, the judge stated, "In my judgment . . . there's ample evidence to support a verdict for second degree murder . . . ." On appeal the defendant contends that the requisite elements of third prong malice,[3] i.e., "that 'in the circumstances known to the defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death would follow [from his] act,' " *Commonwealth* v. *Perry*, 432 Mass. 214, 222 (2000), quoting *Commonwealth* v. *Semedo*, 422 Mass. 716, 720 (1996), could not be found where the evidence suggests that the defendant believed that the gun was not loaded. As a result of the defendant's subjective belief, he argues, the shooting amounted to manslaughter, but not murder.

We view the evidence at trial in the light most favorable to the Commonwealth, and "determine whether . . . *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979). Given the extensive evidence of the defendant's familiarity with the weapon, a jury could reasonably conclude that the defendant knew when, how, and whether his weapon was loaded.

As to the defendant's knowledge at the time of the shooting, the jury heard even more damaging evidence. Of crucial importance is the fact that, immediately before the shooting, both boys warned the defendant that there was still one live round "in there, in the chamber." "Yelling," and "in a voice so [the defendant] could hear," the boys repeated the warning between three and five times. The defendant callously ignored their pleas, telling them to "shut up"[4] because he "kn[ew] his gun." Rather, he proceeded to hold the firearm to the victim's head and to pull the trigger.

Where two witnesses warn a defendant immediately prior to a shooting, we conclude that a rational jury could, beyond a reasonable doubt, find that the defendant knew the gun was

---

[3]The judge did not instruct the jury on the other prongs of malice.

[4]While it would be the height of irresponsibility to ignore such warnings from anyone, irrespective of their familiarity with firearms, we note that both boys knew about guns and occasionally shot hand rifles at a firing range.

loaded.[5] Contrast *Commonwealth* v. *Bouvier*, 316 Mass. 489, 496 (1944) (no evidence that defendant knew gun was loaded).[6] Furthermore, the experiences of this particular defendant, including his familiarity with weapons, are evidence that he should have known that a "plain and strong likelihood of death" would follow from his act. *Commonwealth* v. *Mack*, 423 Mass. 288, 290 (1996) ("intentionally discharging a firearm in the direction of another person creates a plain and strong likelihood of death"). For these reasons, the Commonwealth produced sufficient evidence to support its theory of third prong malice.

3. *Jury instructions on reasonable doubt.* The defendant claims three errors tainted the judge's reasonable doubt charge. These errors, the defendant argues, unconstitutionally lowered the Commonwealth's burden of proof and thereby implicated his due process rights. Where, as here, the defendant contests the adequacy of a jury instruction on reasonable doubt,[7] "we examine the challenged language, in the context of the charge as a whole, in order to determine whether 'a reasonable juror could have used the instruction incorrectly.' " *Commonwealth* v. *LaBriola*, 430 Mass. 569, 570-571 n.3 (2000), quoting *Commonwealth* v. *Smith*, 427 Mass. 245, 249-250 & n.6 (1998). *Commonwealth* v. *Keniston*, 423 Mass. 304, 316 (1996), quoting *Commonwealth* v. *Koonce*, 418 Mass. 367, 371 (1994). Viewing the charge as a whole, we conclude that the instruction adequately conveyed to the jury the requisite degree of certainty

---

[5]The consciousness of guilt evidence (e.g., washing off firearm, relaying false story to police) does not constitute "evidence of malice aforethought," and thus does not factor into our assessment of the defendant's sufficiency claim. *Commonwealth* v. *Epsom*, 399 Mass. 254, 259 (1987).

[6]Where, prior to shooting, the defendant is warned that the firearm is loaded, he cannot avail himself of the "various cases" involving "gun play" or a "defendant [who] did not know that the gun contained live bullets." *Commonwealth* v. *Ward*, 426 Mass. 290, 298, 299 (1997) (declining to sit as "second jury" in Russian roulette case). See, e.g., *Commonwealth* v. *Pichardo*, 45 Mass. App. Ct. 296, 301 (1998) (where jury could conclude that defendant thought gun was empty, "events supported a verdict of manslaughter, but no more"); *Commonwealth* v. *Depradine*, 42 Mass. App. Ct. 401, 406-408 & n.5 (1997) (record and inferences supported manslaughter verdict despite lack of direct evidence that defendant knew there was live round in chamber); *Commonwealth* v. *Griffin*, 8 Mass. App. Ct. 276, 279 (1979) (jury could reach manslaughter conviction where weapon contained "mix of live and blank ammunition").

[7]The judge declined to incorporate certain instructions requested by defense counsel, see notes 10 and 11, *infra*, into his jury charge.

required for conviction. *Commonwealth* v. *Watkins*, 425 Mass. 830, 837-839 (1997). We address each of the defendant's allegations in turn.

(a) The defendant challenges the omission of the "strong probability" language of *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850).[8] In *Commonwealth* v. *Bumpus*, 362 Mass. 672, 682 (1972), vacated on other grounds, 411 U.S. 945 (1973), aff'd on rehearing, 365 Mass. 66 (1974), we considered whether "fail[ure] to charge the jury that a strong probability of guilt is insufficient to convict and that the standard is not one of the preponderance of the evidence" constitutes grounds for reversal. In upholding the convictions, this court stated: "The defendant was not entitled to have the charge phrased in the exact language requested by him since the instructions, taken as a whole, conveyed the meaning established by law." *Id.* Compare *Commonwealth* v. *Keniston*, *supra* at 316-317, with *Commonwealth* v. *Slonka*, 42 Mass. App. Ct. 760, 765-766 (1997).

Here, while the judge strayed from *Commonwealth* v. *Webster*,[9] *supra*, we conclude that the instructions as a whole "correctly conveyed to the jury the level of proof required to convict the defendant." *Commonwealth* v. *Smith*, *supra* at 254, quoting *Commonwealth* v. *Gagliardi*, 418 Mass. 562, 572 (1994), cert. denied, 513 U.S. 1091 (1995). At the charge conference, the judge stated his intention to "go right down the middle with *Commonwealth* and *Webster*" and offer "the standard instruction" set forth in *Commonwealth* v. *Murphy*, 415 Mass. 161, 166-167 n.3 (1993). See *Commonwealth* v. *Crawford*, 417 Mass. 358, 368 (1994), citing *Commonwealth* v. *Murphy*, *supra* at 166-168. The judge also acknowledged that he would not "give every word of [*Webster*, but] will give the substance of it." He instructed the jury that "[a] verdict of guilty cannot be based on probability, suspicion, or speculation," and defined reasonable doubt as "that state of the case when . . . the minds of the jurors are left in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge." He further explained that, "if the Commonwealth has

---

[8]"For it is not sufficient to establish a probability, though a strong one arising from the doctrine of chances, that the fact charged is more likely to be true than the contrary." *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850).

[9]We caution that, "[w]here issues as important as reasonable doubt are concerned, judges would do well to follow approved models." *Commonwealth* v. *Burke*, 44 Mass. App. Ct. 76, 81 (1997).

established only that it is more probable than not that the defendant has committed the offense, then that is not sufficient . . . [and] if your minds are left wavering, unsettled and unsatisfied because of a conscious uncertainty as to the guilt of the defendant, you must also return a verdict of not guilty." Given that the judge included *Webster's* "abiding conviction" language; said in essence that a strong probability of guilt is insufficient to convict; and issued a charge virtually identical to one previously upheld, *Commonwealth* v. *Murphy, supra* at 166-167 n.3, we believe the instruction, even absent *Webster's* "strong probability" language, was constitutionally sufficient.

(b) The defendant claims the jury should have been instructed that "[t]he degree of certainty required to convict is unique to the criminal law."[10] *Commonwealth* v. *Bonds,* 424 Mass. 698, 701 (1997), quoting *Commonwealth* v. *Ferreira,* 373 Mass. 116, 130 (1977). We have never required such an instruction.

(c) The defendant argues that the judge should have made clear that reasonable doubt is equivalent to "near certitude."[11] *Commonwealth* v. *Pinckney,* 419 Mass. 341, 344 (1995). The Supreme Court crafted this term in *Jackson* v. *Virginia,* 443 U.S. 307, 315 (1979), and quoted in *Victor* v. *Nebraska,* 511 U.S. 1, 15 (1994). Subsequently, we have referred to this language, see, e.g., *Commonwealth* v. *Mack,* 423 Mass. 288, 291 (1996); *Commonwealth* v. *Rosa,* 422 Mass. 18, 28 (1996), but have never *required* such language. *Commonwealth* v. *James,* 424 Mass. 770, 788 (1997), quoting *Commonwealth* v. *Mack, supra.* See *Commonwealth* v. *Anderson,* 425 Mass. 685,

---

[10]The defendant's request for jury instructions included: "the prosecution has the burden of proving the defendant's guilt beyond a reasonable doubt. This is the highest standard of proof known to the law. The degree of certainty required to convict is unique to the criminal law. It is not a degree of certainty used in your private lives." See *Commonwealth* v. *Bonds,* 424 Mass. 698, 701 (1997), quoting *Commonwealth* v. *Ferreira,* 373 Mass. 116, 130 (1977). We note that the requested instruction was crafted to emphasize the danger presented when judges employ examples from "private decisions" in their explanations of "beyond a reasonable doubt." *Commonwealth* v. *Latimore,* 423 Mass. 129, 132 n.2 (1996). Where, as here, the judge made no mention of private, everyday decisions in his reasonable doubt instruction, nothing suggests that the "awesome duty" of the jury was unconstitutionally "trvialize[d]" by omitting the requested language. *Id. Commonwealth* v. *Andrews,* 427 Mass. 434, 444-445 (1998).

[11]The defendant requested the following instruction: "Proof beyond a reasonable doubt requires that a jury needs to 'reach a subjective state of near certitude of the guilt of the accused[,]' *Commonwealth* v. *Pinckney,* 419 Mass. 341, 347 (1995), before it may return a guilty verdict."

689-690 (1997). Furthermore, we have noted that *Webster's* "abiding conviction" language impresses on the factfinder "the need to reach a subjective state of near certitude of the guilt of the accused." *Commonwealth* v. *Watkins,* 425 Mass. 830, 838 (1997), quoting *Commonwealth* v. *Pinckney, supra* at 344. For these reasons, we reject the defendant's claim that the instruction was insufficient.

4. *Third prong malice.* In his final argument, the defendant argues for the abolition of third prong malice[12] because "as it currently exists [it] does not require that a defendant possess a morally culpable state of mind when committing the act which results in a death." When raised at trial, the judge "was frankly stunned . . . to [hear] an objection to third prong malice," stating, "As far as I know it's still good law in Massachusetts."[13] The judge was correct. We decline the defendant's invitation to abolish third prong malice.

The facts of this case illustrate the usefulness of third prong malice. The evidence of "the circumstances known to the defendant" was compelling. The defendant, experienced in the use of firearms, held his pistol to the victim's head and fired it, after being warned several times, by two different people, that the weapon was loaded. On the basis of his experience and this information, the defendant should have, at the very least, reexamined the weapon or taken other precautionary measures before pulling the trigger. Ignoring that course of action was particularly grievous where his conduct, firing point blank at another's head, left no room for error. Where a defendant behaves in such a manner, we are satisfied that the degree of moral culpability necessary to support a conviction of second degree murder has been met.

*Judgment affirmed.*

---

[12]The third prong of malice has been defined as the intent to commit an act that "in the circumstances known to the defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death would follow the contemplated act." *Commonwealth* v. *Sama,* 411 Mass. 293, 296 n.1 (1991), quoting *Commonwealth* v. *Grey,* 399 Mass. 469, 470 n.1 (1987).

[13]The judge explained: "The difference between murder in the second degree and involuntary manslaughter here would turn on whether or not according to common experience there was a plain and strong likelihood that death would follow the contemplated act, murder two, or only substantial harm would follow, involuntary manslaughter."