# United States Court of Appeals
## For the First Circuit

No. 01-2018

LONNIE WATKINS,

Petitioner, Appellant,

v.

PAUL MURPHY,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Lynch, Circuit Judge,

Bownes and Magill,[*] Senior Circuit Judges.

Robert L. Sheketoff, with whom Sheketoff & Homan was on brief, for appellant.
Cathryn A. Neaves, Assistant Attorney General, with whom Thomas F. Reilly, Attorney General, was on brief, for appellee.

June 11, 2002

---

[*]Of the Eighth Circuit Court of Appeals, sitting by designation.

**MAGILL**, <u>**Senior Circuit Judge**</u>.  Petitioner Lonnie Watkins appeals the district court's June 26, 2001 denial of his request for a writ of habeas corpus.  The district court had jurisdiction pursuant to 28 U.S.C. § 2254 (1994 & Supp. II 1996).  On July 6, 2001, Watkins filed a timely appeal and a motion for a certificate of appealability on the issues of (1) whether Watkins was denied due process of law when the state trial court gave a supplemental charge on felony murder, and (2) whether he was denied due process of law when the state trial court erroneously defined proof beyond a reasonable doubt.  On July 12, 2001, the district court granted the motion.  Our jurisdiction is proper pursuant to 28 U.S.C. §§ 1291 and 2253 (Supp. II 1996).  For the reasons stated below, we affirm.

## I.

The following facts, which are taken from the Supreme Judicial Court of Massachusetts's (the "SJC") decision in <u>Commonwealth</u> v. <u>Watkins</u>, 683 N.E.2d 653 (Mass. 1997), are entitled to a presumption of correctness.  28 U.S.C. § 2254(e)(1) (1996); <u>see</u> <u>Sanna</u> v. <u>DiPaolo</u>, 265 F.3d 1, 7 (1st Cir. 2001).  The facts are as follows:

On the evening of March 27, and into the early morning of March 28, 1993, Watkins attended a birthday party at a house in the Dorchester section of Boston with several of his friends.  Also attending the party were the victims, Lloyd Industrious and Kevin Christopher, the latter of whom was wearing two large gold chains around his neck.  At some point during the evening, Watkins and at

-2-

least three of his friends, Mark Anderson, Marcus Edwards, and Michael Payne,[1] decided to steal the chains from Christopher. They later agreed they would wait until the party was over before doing so. One of the other guests at the party, Ana Bodden, testified at the trial that about an hour before the end of the party, Watkins and two of his friends showed her the guns they were carrying.[2]

Shortly before 4 a.m., the party ended and the guests began to leave. Bodden and six other party-goers got into a Ford Taurus, with Bodden in the passenger seat. Bodden testified that right before the shooting, Edwards was standing on the sidewalk talking to the driver of the Taurus, Charae Chretien. While Edwards was talking to Chretien, Bodden heard gunshots. She testified that she saw Watkins, Payne, and Anderson shooting at Christopher and Industrious, who were on the ground. Bodden observed someone shoot Industrious as he attempted to stand up; she testified that she thought Payne was the person shooting at Industrious. She identified Watkins and Anderson as the two who shot Christopher. When the shooting stopped, the shooters turned and ran down the street past the Taurus. Bodden testified that she

---

[1]The Commonwealth also prosecuted Anderson, Edwards, and Payne for both the robbery and murders of Christopher and Industrious. Anderson was tried as a juvenile. Edwards and Payne were convicted on both counts, and their convictions were upheld by the SJC. See Commonwealth v. Payne, 690 N.E.2d 443 (Mass. 1998).

[2]Bodden testified that Watkins showed her a gun that he carried under his shirt. Watkins, 683 N.E.2d at 655. Ultimately, however, the jury acquitted Watkins of the charge of unlawful possession of a firearm. Id. at 654 n.1.

saw Anderson grab a chain from Christopher and saw Edwards take a chain from Industrious.

Adrian Castillo, another passenger in the Taurus, testified at trial. She testified that after the party, as she was sitting in the Taurus, and shortly after Edwards spoke with Chretien, she heard gunshots. When Castillo looked up, she saw Payne, Edwards, and another man whose back was toward her, shooting at Christopher. She also saw a man over six feet tall standing alone near the sidewalk side of the automobile, and saw sparks from that side of the automobile. As reported to the police, Watkins is six feet, five inches tall.

At trial, the prosecution played a tape recording of Watkins's statements to the police following his arrest. In these tapes, Watkins apparently admitted that during the party he discussed with his friends the possibility of robbing Christopher and Industrious. However, he said that he later "copped out" of the plan after one of his friends told him they would probably have to kill their victims in order to get the chain(s). Based on these statements, Watkins argued at trial that even if a criminal joint venture existed between Watkins and his friends on the evening of the incident, Watkins withdrew from the joint venture before any crimes were committed, and therefore he should escape culpability for the crimes. The prosecution disputed Watkins's alleged withdrawal.

On June 28, 1994, Watkins was convicted by a jury on two indictments charging armed robbery and two indictments charging

murder in the first degree by reason of extreme atrocity or cruelty and felony murder. The trial judge in the Superior Court sentenced Watkins to two concurrent terms of life imprisonment on the murder convictions, and two terms of from fifteen to twenty years on the armed robbery conviction. Watkins was found not guilty of unlawful possession of a firearm. Watkins appealed these convictions to the SJC. Ultimately, the SJC affirmed his convictions.

**II.**

Watkins argues that two different sets of jury instructions violated his due process rights. As will be shown below, these claims are without merit.

**A. Supplemental Instructions on Joint Venture and Withdrawal**

Watkins's first challenge is to the propriety of the trial judge's jury instructions regarding joint venture and withdrawal. Watkins argues that in responding to the jury's last question to the court, the judge failed to remind the jury of the possibility of withdrawal from a criminal joint venture, thus giving the erroneous view that if Watkins was found guilty of robbery, he should also necessarily be guilty of murder in the first degree. This, Watkins contends, effectively removed from the jury both the issue of withdrawal and the issue of the degree of murder in violation of his due process rights.

The jury's last question was:

Considering the joint venture clause and the relationship of malice to murder, is it contradictory to find someone guilty of armed robbery, but not guilty of murder, if the

-5-

robbery results in the victim's death?  Why or why not?

Upon hearing this question, Watkins's trial counsel asked the judge to respond that such a finding was permissible, based on the doctrine of withdrawal.  Watkins's counsel argued that it would not be contradictory to find a defendant guilty of armed robbery but not guilty of murder because under Massachusetts law, it is possible for an individual to abandon a joint enterprise and avoid guilt for a crime committed subsequent to his abandonment.

The judge did not comply with Watkins's request.  In responding to the question above, the trial judge pointed to an earlier instruction, which correctly stated the law.  That instruction came from an undisclosed SJC opinion and reads:

> [a] defendant who kills [his] victim in the commission . . . of a robbery while the defendant is armed with a gun is guilty of [first degree] murder by application of the felony/murder rule, and conscious disregard of the risk to human life need not be further shown.

After reading this language, the trial judge noted:

> If a defendant is engaged . . . at the time in a joint criminal venture, . . . but is not himself armed with a gun, he is still responsible for the others engaged in that armed robbery, provided that he himself has actual knowledge and knows that the co-venturer is armed with a gun and has the same specific intent.

In conclusion, the trial judge made it a point to remind the jury to consider separately each indictment against Watkins.

Watkins argues that these instructions removed from the jury both the question of withdrawal, upon which the jury had been

-6-

previously and correctly instructed, and the issue of the proper degree of murder for which to convict him.  This, Watkins argues, amounts to a directed verdict in violation of his due process rights, <u>Sullivan</u> v. <u>Louisiana</u>, 508 U.S. 275, 277 (1993), which in turn violates the mandate that all elements of a crime be proven beyond a reasonable doubt.  <u>See</u> <u>In re Winship</u>, 397 U.S. 358, 364 (1970).  While these arguments are novel, they are unsubstantiated by the record before us.

## 1. Presence of a Federal Claim

Before we explore the merits of Watkins's claim, we must first address whether our jurisdiction is proper.  The Commonwealth argues that the district court erroneously reviewed Watkins's petition on the issue of whether the trial court erred when it gave its supplemental instructions.  In particular, the Commonwealth argues that the state-law nature of jury instructions makes such decisions unreviewable.  We review these claims de novo.  <u>Phoenix</u> v. <u>Matesanz</u>, 189 F.3d 20, 24 (1st Cir. 1999).

Here, Watkins claims that his due process rights were violated by the trial judge's supplemental instruction on joint venture, because it did not include a definition of withdrawal and because it instructed the jury to find him guilty of first degree murder if it found him guilty of armed robbery.  While it is axiomatic that it is for state courts to say what state law is, <u>Gilday</u> v. <u>Callahan</u>, 59 F.3d 257, 274 (1st Cir. 1995), it does not logically follow, as the Commonwealth appears to suggest, that all claims that touch upon state law are barred from federal habeas

review.  As we understand it, the Commonwealth's argument on this score appears to be geared more toward the merits of Watkins's claims, and not so much the source of law that forms the basis for those claims.

Although it is true that jury instructions are inherently a question of state law, that does not mean that they are completely unreviewable.  A perfect example is the case before us. In one sense the Commonwealth sees no reason why we want for jurisdiction on the "moral certainty" instruction, yet it argues that we are without jurisdiction to hear the issue regarding the supplemental instructions.  Here, Watkins correctly frames his arguments regarding the supplemental instructions in terms of having the effect of removing from the jury consideration of both the issue of withdrawal and the issue of the degree of the murder committed.  In doing so, Watkins calls into question whether this instruction had the effect of removing an issue from the jury that needed to be proved beyond a reasonable doubt.  If this were true, the requirement that all elements of a crime need to be proven beyond a reasonable doubt would be compromised in derogation of due process rights guaranteed by the United States Constitution, Winship, 397 U.S. at 364.  Thus the trial judge, in essence, may have directed a verdict when there were issues of fact to be resolved, in violation of the Court's decision in Sullivan.  508 U.S. at 277.

As noted above, the Commonwealth confuses the underlying strength of Watkins's claim with the underlying foundation upon

which that claim is based.  It is this error that is the foundation upon which the Commonwealth's challenge to our jurisdiction rests. However, because Watkins's claim does not lie solely in state law, but rather rests firmly within the ambit of the United States Constitution, we find no error in exercising jurisdiction over the merits of Watkins's claim.

## 2.  Proper Standard of Review

We face one more hurdle, however, before we are able to reach the merits of Watkins's claim.  The parties dispute the proper standard of review.  Watkins argues that the proper standard of review for his claim on this issue should be de novo because the SJC did not address the federal constitutional question, although Watkins raised it.  The Commonwealth, both in its brief and at oral argument, vigorously argue that the proper standard of review for this claim is the more stringent standard imposed by the Antiterrorism and Effective Death Penalty Act ("AEDPA").[3]  In so arguing, the Commonwealth appears to rely on the same arguments on which it disputes our jurisdiction, and once again fails to understand the difference between the merits of Watkins's claim and the underlying basis for his claim.  In doing so, the Commonwealth calls into question this court's decision in Fortini v. Murphy, 257

---

[3]Under AEDPA, the federal courts must accept a state's legal ruling unless it is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1) (Supp. II 1996).

-9-

F.3d 39 (1st Cir. 2001), without providing any explanation as to why it should not apply.

As we held in Fortini:

> AEDPA's strict standard of review only applies to a "claim that was adjudicated on the merits in state court proceedings." 28 U.S.C. § 2254(d). Here, the federal claim was never addressed by the state courts. All of the cases that have touched on this problem (none is directly in point) assume that the statute applies only when the state court decided the federal issue. After all, AEDPA imposes a requirement of deference to state court decisions, but we can hardly defer to the state court on an issue that the state court did not address. Cf. Williams v. Taylor, 529 U.S. 362, 402-06 (2000).

257 F.3d at 47 (footnote omitted) (emphasis added). The language of Fortini could not be more clear. Properly understood, Fortini instructs us that if state courts want us to defer to their rulings, they must, at a bare minimum, address the constitutional issue when properly raised. That is, if they do not address the constitutional claim, we have nothing to defer to. When determining the proper standard of review, we should avoid going against the plain language of the AEDPA, as Fortini clearly recognized. We now take this opportunity to reinforce what we said in Fortini. Accordingly, because the SJC did not discuss Watkins's federal constitutional claim, although it was raised in that court, we review Watkins's claim de novo.

### 3. De Novo Analysis of Watkins's Claim

As we noted above, Watkins argues that the trial court's supplementary instruction on joint venture gave the jury the

erroneous view that if it found him guilty of armed robbery, it would then be required to find him guilty of first degree murder, lest it be contradictory. This, Watkins argues, amounts to a directed verdict and therefore violates due process. As Watkins points out, it may very well be possible for someone to withdraw from a joint venture too late to avoid responsibility for his coventurers' commission of an armed robbery, but in time to avoid responsibility for their subsequent commission of murder. While this may be possible in the abstract, it cannot be so on the facts before us.

The facts of this case clearly show that both the murders and robbery were intertwined, with the robbery occurring either during or directly after the murders. Under Massachusetts law, an individual may only escape liability for felony murder by virtue of withdrawal if there was "'at least an appreciable interval between the alleged termination [of the joint venture] and the fatal shooting, a detachment from the enterprise before the shooting [became] so probable that it [could not] reasonably be stayed.'" Commonwealth v. Fickett, 526 N.E.2d 1064, 1069 (Mass. 1988) (quoting Commonwealth v. Green, 20 N.E.2d 417, 422 (Mass. 1939)). Because Watkins alleges his withdrawal occurred prior to the robbery, not between the robbery and the murders (if any such time actually existed), if the jury actually believed that Watkins "copped out," it would have had to acquit him of both the robbery and the murder.

Furthermore, the judge's response to the jury's question appropriately reiterated the proper legal standard under Massachusetts law. The mere fact that the trial judge did not remind the jury of the possibility of withdrawal did not, in any way, interfere with the jury's determination of the facts. In fact, after instructing the jury, the trial judge made it perfectly clear that even if the jury was to find Watkins guilty of robbery, it still needed to consider each charge in the indictment separately. Considering that the trial judge had properly instructed the jury earlier not once, but twice, on the issue of withdrawal, there is no reason to assume that the jury did not follow these instructions. Factually speaking, there is no way that the trial judge's instructions impermissibly directed a verdict of guilty on the murder charge or invaded the province of the jury's duty to find facts. In fact, the supplemental instruction focused on a defendant "engaged . . . <u>at the time in a joint criminal venture</u>" (emphasis added) and so left open the possibility of the defendant having withdrawn from the joint criminal venture before the murder. The instruction did not withdraw the issue from the jury.

## B. Reasonable Doubt Instruction

Watkins's next claim involves the propriety of the trial judge's instruction to the jury regarding the proper meaning of "beyond a reasonable doubt." It is well established that in every criminal trial, the state must prove every element of the offense charged beyond a reasonable doubt. <u>Winship</u>, 397 U.S. at 364.

-12-

Watkins contends that in his trial, the trial judge's instruction on the meaning of the words "beyond a reasonable doubt" was severed from any language stressing the high degree of certainty required to convict a defendant, and therefore "there is a reasonable likelihood that the jury understood the instruction[] to allow conviction based on proof insufficient to meet the Winship standard." Victor v. Nebraska, 511 U.S. 1, 6 (1994).[4] Accordingly, Watkins argues, "there has been no jury verdict within the meaning of the Sixth Amendment." Sullivan, 508 U.S. at 280. We disagree.

In making our determination, we direct the parties to the well-reasoned opinion of the district court that correctly held that the jury instructions in question were constitutional. In addressing the merits of Watkins's claim, the district court reviewed in earnest the challenged instruction. Watkins v. Murphy, No. 98-11114-NG, slip op. at 7-9 (D.Mass. June 26, 2001). As the district court correctly pointed out, while reference to the phrase "moral certainty" might be constitutional error in certain circumstances, the use of the phrase in the jury instruction before us, in the context of the instruction as a whole, appropriately conveyed the concepts of proof and reasonable doubt. Id. at 13-15. For the reasons contained within the opinion of the court below, we affirm that court's decision to deny the writ on the basis that the

_____

[4]In particular, Watkins argues that the inclusion of the phrase "moral certainty," which is inherently difficult to grasp, in the jury's instructions violates his due process rights because it permitted the jury to convict him on something less than proof beyond a reasonable doubt.

jury instruction in question did not violate Watkins's due process rights because it adequately conveyed the meaning of proof beyond a reasonable doubt.

### III.

For the foregoing reasons, we affirm the district court's denial of Watkins's petition for a writ of habeas corpus.